The State <em>against</em> Bull and others.

In *May*, 1833, the General Assembly passed an act, by which it was provided, that an insurance company should be established in the city of *Hartford*, with a capital of 100,000 dollars, divided into shares of 20 dollars each; that subscriptions to the capital stock should be opened in that city, under the superintendence of seven commissioners, [named in the act,] at such time or times, place or places, as they should appoint; that such subscriptions should continue open three days, when they should be closed; that if more than 100,000 dollars should be subscribed, the commissioners should deduct the excess; that if the aggregate subscriptions should not amount to that sum, the subscriptions to complete it, might remain open, or be opened anew, at some subsequent time or times, as the commissioners should determine; and further subscriptions might then be made, not exceeding the sum required to complete the amount of 100,000 dollars; that there should be paid to the commissioners, by the subscribers to the stock, at the time of making such subscription, one dollar on each share, for the use of the company; and that after the stock should be fully subscribed, the subscribers or proprietors thereof, their successors, &c., should be a corporation. In *June*, 1833, the commissioners opened subscriptions for this stock, in the city of *Hartford*, due notice of the time and place being publicly given; when subscriptions to the amount of 15,000 dollars only were made, and the subscribers paid one dollar

*Hartford,*
June, 1844.

The State
*v.*
Bull.

on each share subscribed  The subscriptions were thereupon closed; and soon afterwards, the commissioners repaid to the subscribers the money so by them paid. No action was again had on this subject, until the 16th of *March*, 1844, when the commissioners opened subscriptions anew, in the city of *Hartford,* without giving any public notice thereof, or of the time and place of subscribing; and one person subscribed for 4,800 shares, and two other persons for 100 shares each, making in all, 5000 shares, the whole number prescribed by the charter, the subscribers paying one dollar on each share.  These subscribers, soon afterwards, claimed to be a corporation, and chose directors, who assumed the powers conferred upon directors, by the charter, and threatened to engage in the business of insurance against loss by fire, in the city of *Hartford.*  On an information, in the nature of a *quo warranto,* filed in *June,* 1844, it was held, 1. that the act of incorporation, offered by the commissioners, who were the agents of the state, to such as would accept it, upon the terms and conditions proposed, was not accepted within a reasonable time; 2. that the subscriptions made in 1844, were of no avail, for want of public notice of the time and place of opening subscriptions anew; 3. that the trust conferred upon the commissioners, by the charter, in 1833, must now be considered, under the circumstances of the case, as having been surrendered, and cannot be renewed, without a new expression of the will of the legislature.

THIS was an information in the nature of a *quo warranto,* brought in *June,* 1844.

The information stated, That in *May,* 1833, the General Assembly passed an act or resolve, purporting to constitute certain persons therein designated, a corporation or body politic, by the name of *"The Connecticut Life and Fire Insurance Company."*  The provisions of this act are then set forth, among which the following are the most material in this case : That an insurance company shall be established in the city and county of *Hartford,* in the state of *Connecticut,* under the name and title of *The Connecticut Life and Fire Insurance Company,* with a capital of 100,000 dollars, divided into shares of twenty dollars each; to be subscribed, paid for and secured, by individuals, companies or corporations, in the manner hereinafter specified.  Subscriptions to the capital stock of said company may be opened in the city of *Hartford,* under the superintendence of seven commissioners, at such time or times, place or places, as said commissioners shall appoint ; and shall continue open three days, from ten o'clock A. M. till three o'clock P. M. on each day, when the same shall be closed ; and if it shall then appear, that more than 100,000 dollars shall have been subscribed, the said commissioners shall deduct the excess from the larger subscriptions, in such manner, that no subscription shall be reduced, while

any one remains larger ; and in case the aggregate subscriptions shall not amount to 100,000 dollars, the subscriptions to complete said sum may remain open, or be opened anew, at some subsequent time or times, as the commissioners, or a majority of them, shall determine ; and further subscriptions may be then made, not exceeding the sum required to complete the aforesaid amount of 100,000 dollars. When the subscriptions shall be opened as herein before directed, there shall be paid to said commissioners, by the individual, company, or corporation subscribing to the stock, at the time of making such subscription, one dollar on each and every share by them subscribed, for the use of said *Life and Fire Insurance Company.*

That after the stock shall be fully subscribed and taken up, the subscribers or proprietors thereof, their successors and assigns, shall be, and are hereby, created a corporation and body politic, by the name and style of *The Connecticut Life and Fire Insurance Company.*

The stockholders shall have power to increase the capital stock of the corporation, by new subscriptions, or otherwise ; provided that the increase or addition shall not exceed the sum of 100,000 dollars ; and provided also, the owners of at least a majority of all the stock shall concur in that measure.

That when it shall be ascertained, by the commissioners, that the subscriptions to the capital stock of said corporation are completed, the stockholders shall be duly notified (in at least two newspapers printed in *Hartford,*) to attend a meeting to be held for the choice of directors, at such time and place, as shall be designated by said commissioners ; and at such time and place, the meeting shall proceed to elect the directors, and do any other business that may be proper and expedient.

*James Dodd, Julius Catlin, E. P. Prudden, William Hayden, James T. Pratt, Thomas Roberts,* and *Job Allyn,* are hereby appointed commissioners under this act, for the purposes mentioned therein.

The information then alleged, That *James Dodd* and the other persons named in said act as commissioners for the purposes therein mentioned, on the        day of *June,* 1833, opened subscriptions for the capital stock of said corporation, at *Union Hall,* in the city of *Hartford,* under their superintendence ; which time and place were by them appointed, agree-

ably to the requirements of said act ; and due notice of such time and place, and of the opening of subscriptions for said stock, was by them publicly given ; that said subscriptions were by them kept open, at said time and place, in the manner by said act prescribed ; and while they so remained open, sundry persons subscribed to the capital stock of said corporation, the aggregate of which subscriptions did not amount to the sum of 100,000 dollars, but did amount to the sum of 15,000 dollars only :

That said sum of 15,000 dollars having been so subscribed, the subscriptions were thereupon closed, from that time until the 16th day of *March*, 1844, when subscriptions to said capital stock were again opened, in the manner hereinafter stated :

That the persons who subscribed said sum of 15,000 dollars, did, at the time of subscribing said sum, pay to said commissioners, each, the sum of one dollar *per* share for every share by them subscribed, according to the requirements of said act ; but that said commissioners, at said time, or soon after, repaid to said subscribers the sum by them so paid :

That from the time of the passage of said act, in *May*, 1833, until the 16th day of *March*, 1844, neither said commissioners, nor any other person or persons, have done, or pretended to do, any act under or by virtue of said act ; and that all that ever has been done, or that has ever been attempted to be done, under or by virtue of said act, during said period of time, is the opening of said subscriptions, the receiving of said subscriptions, amounting to the sum of 15,000 dollars, and the payment and refunding of said sum of one dollar on each share of said stock, as before stated :

That the powers, rights, privileges and franchises, which said act purports to grant and convey, have, between the passage of said act, in *May*, 1833, and said 16th day of *March*, 1844, been, in no other way or manner, used, exercised or enjoyed, or attempted to be used, exercised or enjoyed, than as is herein before stated :

That on the 16th day of *March*, 1844, said commissioners, or a majority of them, determined to open the subscriptions to said capital stock anew, in the city of *Hartford*, on that day, and did, at that time and place, open said subscriptions anew, without however giving any public notice thereof, or of the time and place of opening the same, and did keep

such subscriptions open, at said time and place, in the manner by said act required ; that at said time and place, when and where said subscriptions were so opened anew, *Marcus Bull* subscribed for 4800 shares of said capital stock, *Job Allyn* for 100 shares, and *E. S. Alford* for 100 shares, making in all 5000 shares, the whole number permitted and required by said act ; and the sum of one dollar on each of said shares, was then and there paid in, by the persons so subscribing, in the manner provided in said act ; and said 5000 shares, being so subscribed, by said *Bull*, *Allyn* and *Alford*, the subscriptions were thereupon, by said commissioners, closed :

That *Harris Hayden* is now, and for some time past has been, the holder of fifty shares, and twelve other persons are now, and for some time past have been, each the holder of one share, of said capital stock, which they severally acquired, by transfer from the original subscribers :

That the subscriptions to said capital stock being completed as aforesaid, said commissioners, on the 14th of *April*, 1844, notified the stockholders of said pretended corporation, to attend a meeting to be held at the *City Hotel* in *Hartford*, on the 25th of said *April*, for the purpose of choosing directors for said pretended corporation, which notice was given in the manner by said act prescribed ; at which time and place the stockholders proceeded to elect *Marcus Bull* and others to be directors ; that said persons so appointed to be directors of said pretended corporation, are claiming, that the powers, rights, privileges and franchises, granted by said act of the General Assembly, are in full life, and that said subscribers to said stock, on said subscriptions being so completed, became a corporation, invested with all the powers, rights, privileges and franchises, which said act purports to grant and convey ; and that said persons so appointed to be directors, are assuming to act as a body politic and corporate, under and by virtue of said act, and are exercising, using and enjoying, in said *Hartford*, certain corporate powers and privileges, under colour thereof :

That said *Marcus Bull* and others, so appointed to be directors as aforesaid, threaten, as such body politic and corporate, to engage in the business of insurance against loss by fire, in the city of *Hartford*, and to issue policies of insurance against loss by fire, in the name and behalf of said pretended

body politic and corporate, and are assuming to exercise the powers and duties of directors of said incorporated body politic, in the city of *Hartford*, under and by colour of said act, and the aforesaid proceedings :

That said powers, privileges, rights, immunities and franchises, which said act of the General Assembly purports to convey, are, and for a time have been, totally forfeited and lost, by reason of neglect to use, exercise and enjoy the same, as herein before set forth, and by reason of the other matters aforesaid ; and that said *Marcus Bull* and others, in so assuming to act, and in so exercising, and assuming to exercise, said powers, rights, immunities, privileges, franchises and offices, have usurped, and are usurping, the said powers, rights, immunities, privileges, franchises and offices, contrary to law and against the peace of the state.

To this information there was a general demurrer ; and the case was thereupon reserved for the advice of this court.

*T. C. Perkins*, in support of the demurrer, remarked, 1. That the charter has been accepted ; there has been an organization under it, conducted by public officers appointed by the state for that purpose ; the subscribers have acquired vested rights in the franchise and the stock ; and they have transferred a part of the stock, in which the assignees have acquired a vested interest. The state will not now interfere to vacate the charter, and destroy these vested rights, unless it clearly appears, that there has been illegality in the proceedings.

2. That the charter will receive a liberal and fair construction, and the legislature will be presumed to have had good and wise reasons for granting it *as it is ;* and if there exists any doubt, that construction will be given, which will sustain, rather than that which will defeat, the grant. He then contended,

3. That the neglect to organize under the charter, for the period of ten years, did not operate as a forfeiture of the charter. The legislature anticipated that the stock might not be taken up immediately, and accordingly provided for such a contingency. The 1st section, after prescribing the manner of opening subscriptions, provides, that " in case the aggregate subscriptions shall not amount to 100,000 dollars,

they may remain open, or be opened anew, at some subsequent time or times, as the commissioners, or a majority of them, shall determine." The legislature contemplated, that although the business of the country might not require another company *then*, it might *afterwards*. It was left in the discretion of the commissioners to determine when that time had arrived. This discretion they have exercised ; and the court will presume, that they have exercised it *soundly*. *Walker* v. *Devereaux*, 4 *Paige*, 251. The next section provides, that after the stock shall be fully subscribed and taken up, the subscribers, &c. shall be a corporation. It was what is termed an *offered* corporation ; and in the case of such corporations, lapse of time does not operate as a withdrawal by the state of the proposal ; nor will it justify the court in pronouncing that a law existing in the statute book, though dormant and unexecuted, has become a *dead letter ;* (4 *Gill & Johns.* 187.) especially, where officers are appointed by the charter to determine when it should become operative. At any time previous to its acceptance, the legislature might have withdrawn the offer ; and not having done so, it remained open and binding, on the 16th of *March*, 1844. And the fact that the state did not, by a resolve, withdraw the proposal, is evidence that they deemed the public good might require the corporation to go into operation.

4. That the withdrawal of the original subscriptions, did not affect the continuance of the offer, on the part of the state. *That* remained as it would have been, if no subscription had been made. The original subscribers do not complain. 4 *Paige,* 248.

5. That the commissioners were not *functi officiis.* By the express terms of the 1st section of the charter, their powers were not exhausted, by a partial subscription. These powers were continued until the subscriptions were completed, at such subsequent times as they thought proper to appoint.

6. That no public notice of the time and place of receiving subscriptions, was required by the charter. It certainly was within the power of the legislature to grant such a charter ; and putting the most unfavourable construction upon it, it would only be incorporating such subscribers as the commissioners should give the stock to, upon the principles laid

down in the charter. A rule of apportionment is given, in the 1st section of the charter, for the subscriptions made at the first opening of the books; but no rule of apportionment is given for the subsequent subscriptions, because the commissioners were then empowered to receive only so many subscriptions as would complete the capital stock. A public notice of the time of these subscriptions would have been of no practical avail, as the first subscriber might have taken the whole stock, and the commissioners could take no more subscriptions, if offered. Here, the want of notice is no fraud on the public, because the public had declined the offer, when the subscriptions were first opened; and until *March* 16th, 1844, no association could be found to take the stock, although the proposal had been constantly open.

7. That the subscriptions were properly opened for the whole sum of 100,000 dollars. The original subscriptions were withdrawn, by the subscribers, with the consent of the commissioners; and the first instalment was repaid to, and received by, such subscribers. The whole matter rested in this position, for ten years. They could in no sense be considered as existing subscribers, when the subscriptions were re-opened.

8. That if the subscriptions should have been received to the amount of 85,000 dollars only, the fact that they were open for 100,000 dollars, vacates neither the charter, nor the organization; and furnishes no ground to sustain a *quo warranto ;* for the excess of 15,000 dollars will be deemed to be holden *in trust,* and for the *benefit,* of the original subscribers of that amount, who, upon the supposition, are entitled thereto. *Walker* v. *Devereaux,* 4 *Paige,* 246.

*Hungerford* and *Toucey,* contra, contended, 1. That the commissioners were mere agents of the state; and no corporation was, or could be, formed, until the stock was properly taken up. *Walker* v. *Devereaux,* 4 *Paige,* 229.

2. That no authority was given to the subscribers to become a corporation, unless by a substantial compliance with the provisions of their charter, which has not been had, because the preliminary steps required of the agents, were conditions precedent, and must be taken, before a corporation could be formed; and these were not complied with.

*Hartford,*
June, 1844.

The State
*v.*
Bull.

First, the charter requires the subscriptions to be opened under the superintendence of the commissioners; and this implies, that they are to be opened in the usual and customary manner, and of course, that notice should be given. Secondly, the charter requires them to be opened, at such time and place as they shall appoint. This is to be taken with reference to the purpose and object of the appointment, and implies that notice of time and place is to be given. Thirdly, the commissioners so understood this, and directed and gave notice accordingly, in the first instance. Fourthly, the commissioners, if the whole stock is not subscribed, the three first days, may continue the subscriptions open, or open them anew; which implies, that if they are opened anew, they are to be opened in the same manner as at first; and of course, notice was necessary. As to the necessity of notice, see *Pritchard* v. *Atkinson,* 3 *N. Hamp. R.* 338. *Harlow* v. *Pike,* 3 *Greenl.* 438. Case of *Hinckley* & al. 15 *Pick.* 447. Fifthly, by the express provisions of the charter, they are not to become a corporation, until the whole subscription is taken up.

3. That the subscription has not been taken up according to the express provisions of the charter: because, First, the stockholders were not to be a corporation, until all the stock was taken up; and of course, did not become such, by the subscription of the 15,000 dollars. Secondly, by the terms of the charter, if the books were opened anew, the subscriptions were to be taken only to the amount necessary to complete the capital of 100,000 dollars; whereas they have taken them to the full amount. Thirdly, unless they can recall the amount refunded to the original subscribers, or their subscription is a nullity, the full amount is not yet in reality taken up, into this sum of 15,000 dollars; that is to say, having taken up a valid subscription at first of 15,000 dollars, they could, on opening the books anew, take up the balance of the 100,000 dollars; and what they allowed beyond that, must be a nullity; and having refunded the 15,000 dollars, first subscribed, unless it can be recalled, there is, in effect, but 85,000 dollars taken up.

4. That the commissioners, by receiving the first subscriptions, and refunding the money, exhausted their authority, and became *functi officiis :*—because, First, they did it upon the

ground and with an intention of abandoning the project; and such must be the inference. Secondly, what was first subscribed, was lawfully subscribed; and the commissioners, to that extent, were bound by it; and *so far their power was gone.* Thirdly, all the power which they possessed after the 15,000 dollars was subscribed, was to receive subscriptions, and one dollar on each share for the balance of the 100,000 dollars; and unless they could recall the money refunded, they could receive and would have, at the time of the last subscription, only 3400 dollars; whereas the charter requires them to have 4000 dollars to commence with. Fourthly, by receiving the first subscriptions, and refunding the money, they entirely put it out of their power to comply with the charter, unless they, or the company, could recover back the money: which neither of them could do. Fifthly, those who first subscribed, were, at all events, entitled to the full amount subscribed for; as the commissioners were authorized only to take further subscriptions to complete the balance, and, of course, if any deduction were made, it must be from the last subscribers. Sixthly, the books were not opened anew to complete the subscription, but to take a subscription for the whole amount of capital; and such a subscription was received. *Williams* v. *Cable,* 7 *Conn. R.* 119. *Kellogg* v. *Wadhams,* 9 *Conn. R.* 202. *Webster* v. *Merriam, Id.* 230. *The State* v. *The Norwalk and Danbury Turnpike Company,* 10 *Conn. R.* 157. *Turnpike Society* v. *Hosmer,* 12 *Conn. R.* 361. *Camp* v. *Bates,* 13 *Conn. R.* 1. See also *Williams* v. *The Hartford and New-Haven Rail-road Company,* 12 *Conn. R.* 398. 404. and authorities cited *ibid.*

5. That the stock was not taken up in a reasonable time; and therefore, the commissioners had no authority to act; and if there had been a subscription to the full amount, and the corporation had neglected to act, for this length of time, the charter would have been avoided or forfeited:—because, First, the charter contains a mere proposal for a contract on the part of the state, with such persons as choose to accept that proposal, upon the terms therein specified; and to make it valid, the acceptance must be unqualified, and within a reasonable time; otherwise, it is not binding upon the state. *Averill* v. *Hedge,* 12 *Conn. R.* 424. and cases therein cited. Secondly, the commissioners had a right to retain the money

*Hartford*,
June, 1844.

The State
*v.*
Bull.

paid upon the first subscriptions, so long as they had the right of opening, or keeping open, the books for subscription. Could they have done it for ten years? Thirdly, if there is no limitation in time for filling up the subscriptions, but the mere discretion of the commissioners, it might, for a long time, by means of the commissioners and first subscribers acting in concert, be wholly out of the power of the legislature to recall the proposition; although no corporation should in fact ever be formed. Fourthly, the object of the legislature in granting the charter, was of a public, and not of a mere private character; and if the duties devolving upon the company were not performed, then they had a right to rescind the contract; and it is immaterial whether the company was organized or not, except that in case of an organization, it might be necessary to use the *quo warranto*, whereas if it was not organized, it might have been otherwise. *Terret* v. *Taylor*, 9 *Cranch*, 43. *Mumma* v. *Potomac Company*, 8 *Pet. R.* 281. *The People* v. *The Bank of Hudson*, 6 *Cowen*, 217. *The People* v. *The Kingston and Middletown Turnpike-road Company*, 23 *Wend.* 194. *The People* v. *The Bristol and Rensellaerville Turnpike-road Company*, *Id.* 223. *The People* v. *The Hillsdale and Chatham Turnpike-road Company*, *Id.* 254. *The Ohio Canal Company* v. *The Baltimore and Ohio Rail-road Company*, 4 *Gill & Johns.* 1. *The King* v. *The City of London*, 4 *State Tri.* 769. *The King* v. *Passmore*, 3 *Term R.* 244. *Ang. & Ames on Corp.* 510. *et passim*.

6. That if it be claimed by the defendants, that the first subscription of 15,000 dollars, is to be treated as a nullity, then the after subscriptions must be considered and deemed as an original subscription, if any thing; and every body had a right to subscribe; and if more than the amount of capital was subscribed, it should have been reduced, in the manner specified in the charter, and notice of time and place given, and the books kept open for three days; and if the first subscription is not to be treated as a nullity, then there must be 15,000 dollars of bad stock taken up at the last subscription, which cannot be distinguished from the other; which makes the whole bad.

CHURCH, J. The commissioners appointed under this charter, to receive subscriptions to the stock of the proposed

*Hartford,*
June, 1844.

The State
*v.*
Bull.

Insurance Company, were the agents of the state, empowered to offer an act of incorporation to such as would accept it, upon the terms and conditions proposed.

The legislature was influenced in granting the charter, by what it supposed the public interest, at *that time*, required. We cannot presume, that it was enacting a supernumerary charter, to be laid away among the state records, to await either the convenience or necessity of future times. Nor can we, without great disrespect, suppose, it intended to give opportunity for the exercise of favouritism, or to prevent competition in subscriptions. And that there should be no monopoly of the stock, by a few, but that every body should have the privilege of subscribing, the commissioners were directed *to open* subscriptions in the city of *Hartford*, at such times and places as they *should appoint*, which should *continue open* three days. But to open books, and even to keep them open for any length of time, without affording to the community, by a public notice, a reasonable chance of knowing when and where they were to be found, would defeat the intention of the legislature, and be a palpable evasion of the law. The duty, therefore, imposed by the charter, upon the commissioners, of opening subscriptions, at prescribed times and places, or as they *should appoint*, necessarily involved the duty of giving reasonable public notice thereof; and a subscription taken without such notice, would not then have been sanctioned. And so, the commissioners, at the outset, understood it themselves, and, therefore, they gave the notice required.

The first effort to obtain subscriptions failed; and no more than fifteen thousand dollars were obtained. The legislature had anticipated this contingency, and had provided, that in such case, the commissioners might continue the subscriptions open, or might *open them anew*, at some subsequent time. The commissioners, supposing that the stock would not be taken up, and ascertaining, probably, that the public necessity required no more at their hands, repaid to the subscribers the small instalment which had been paid by them, closed the subscriptions and retired from the concern.

All remained as if nothing had been done. No action was again had on this subject, until after the lapse of more than ten years. Now, the charter has been looked up, and the

commissioners, without any renewed action of the legislature, have *opened the subscriptions anew,* without giving any public notice at all, of the times and places of subscription; and in this covert manner, by the subscriptions of a few individuals, have obtained the requisite amount. This proceeding, in our judgment, cannot be sustained. It was a perversion of the purpose of the legislature—a violation of the spirit, if not of the language, of the charter.

If, upon the first opening of the books, for subscription, it was necessary that a public and general notice should be given; this was, for the same reasons, equally necessary, when they were opened anew. The last opening of the subscriptions was not a continuation of the former proceedings, ten years before, but a proceeding *de novo;* and, by the course pursued, no opportunity has been given to any, but perhaps a favoured few, to become subscribers to the stock of this company.

The foregoing considerations are decisive of our opinion on this subject. But there are others, which confirm it. The commissioners, who had been appointed, in view of the state of things then existing, performed the duty required of them. They offered the charter for public acceptance; and it was declined. They restored to the subscribers all they had advanced, and abandoned the project. In the meantime, perhaps, other corporations may have been created, to supply the public necessities, which once were supposed to exist; and the legislature have not again spoken on the subject. Under these circumstances, and because this charter was not accepted within a reasonable time, we think the trust conferred upon the commissioners must be considered as having been surrendered; and that it cannot be resumed, now, without a renewed expression of the will of the legislature.

We hold the information to be sufficient.

In this opinion, the other Judges concurred.

Demurrer overruled.