SAMUEL M. ROOSEVELT & others *vs.* GEORGE K. HAMBLIN, administrator, & others.

Suffolk.   December 4, 5, 1907. — May 22, 1908.

Present: KNOWLTON, C. J., MORTON, HAMMOND, BRALEY, & RUGG, JJ.

*Corporation.*

By St. 1855, c. 140, afterwards Pub. Sts. c. 105, § 9, and now R. L. c. 109, § 13, which provides that the persons named in an act of incorporation "and their associate subscribers to stock before the date of the act shall hold the franchise or privileges granted until the corporation .is organized," it is necessarily implied that the franchise does not remain in the incorporators as such after the corporation is organized.   Where there are no subscribers to the stock before the date of the act of incorporation, the franchise is held by the incorporators named in that act until the corporation is organized, and if such an incorporator refuses to subscribe to the stock and fails to become a stockholder he ceases upon the organization of the corporation to have any interest in its franchise.

Under the statute which now is R. L. c. 109, § 13, which provides that the persons named in an act of incorporation "and their associate subscribers to stock before the date of the act shall hold the franchise or privileges granted until the corporation is organized," a corporation is organized within the meaning of the statute when the first meeting has been called and held, the act of incorporation has been accepted, the officers have been elected and by-laws for future meetings have been adopted, at least where there are any stockholders.   It does not matter that at the time of the meeting only a very small part of the stock of the corporation has been subscribed for.

HAMMOND, J.   In this suit as it now stands, the plaintiffs, being two of the thirteen incorporators named in the act incorporating the Boston Elevated Railway Company, seek to recover two thirteenths of the sum of $400,000 paid by one Morgan under contracts between him and seven of the other incorporators.   Of these seven incorporators three, Hyde, Towle and Patch, are now dead.   The defendants comprise the representatives of the Towle and Patch estates respectively, and the other

four incorporators, making six in all. No representative of Hyde has been made a party to the suit. But inasmuch as he was one of the seven incorporators between whom and Morgan the contracts above named were made, we shall, in describing the transactions, as a matter of convenience include him with the other six defendants above named, and shall use the term "defendants" to describe these original seven. Snow, the other defendant, being made a party for the sole reason that he as trustee holds for the benefit of whom it may concern a part of the money paid by Morgan, will be noticed no further in this opinion.

The case was sent to a master who found the facts and made certain rulings; and finally ruled that the bill should be dismissed. The plaintiffs excepted to the report " on the ground that upon the facts found by the master and stated in the report the master should have ruled that the plaintiffs' bill of complaint can be maintained, and that the plaintiffs are entitled to the relief prayed for as against the incorporator defendants and the funds in the hands of the defendant Snow as trustee." The case is before us upon a reservation by a single justice upon the pleadings, the master's report and the exceptions thereto.

The facts although quite numerous are simple and may be summarized as follows. By St. 1894, c. 548, the Boston Elevated Railway Company was incorporated. There were thirteen incorporators named in the act, of whom the plaintiffs were two and the defendants seven. The manner in which the several incorporators became interested in the enterprise before the passage of the act is set forth in the master's report, and the details need not here be repeated. At a duly notified meeting of the incorporators held on August 3, 1894, at which were present ten of them, including all the parties to this suit except Myers, the act of incorporation was accepted, a code of by-laws was adopted, officers and directors were elected thereunder, and the capital stock was fixed at twenty millions of dollars. Among other things the by-laws provided that the " first board of directors shall be elected by the incorporators and their associates, and thereafter the directors shall be elected by ballot at the annual meeting of the stockholders for the ensuing year, and they shall hold office until their successors are elected. Any vacancy in

the board may be filled for the unexpired term by the remaining members of the board." The by-laws fixed the second Monday in January in each year as the date of the annual meeting of the corporation, and contained the following provision: " The board of directors or the executive committee as hereinafter provided shall have the management of all the property, business affairs, and interests of the corporation. All the powers of this corporation so far as is consistent with the laws of the Commonwealth of Massachusetts are hereby vested in said board and in said executive committee when said board is not in session." It was voted that the executive committee " be hereby authorized to open a subscription list for the capital stock of the corporation," and that the " board of directors and its executive committee be authorized to enter into contracts in behalf of the corporation for the construction and equipment of its lines of railway." No other business was transacted at this meeting, nor at any time thereafter was any business transacted or vote passed (other than a vote of adjournment) at any meeting of the incorporators as such, although this meeting of August 3 was several times adjourned from day to day until December 14, 1895, when it was adjourned without day. On August 3, 1894, directly after the meeting of the incorporators, the directors held a meeting and elected Whittier president, Towle vice-president, Howland general counsel, Meigs chief engineer, and Towle, Whittier and Hyde executive committee; and voted that the executive committee be authorized to open a subscription list for the capital stock. Thus the corporation was fully organized. The directors adjourned the meeting from time to time, passing various votes not here material, until November 17, 1894, when the meeting was adjourned without day.

Meanwhile the executive committee had held two meetings, one in August, 1894, and one on November 3, 1894. At this last meeting it was voted that the chairman (Towle) be directed to open subscriptions for the capital stock of the company; and the defendants signed a paper of that date by which each subscribed for fifty shares of the stock and agreed to pay the price as the same should be called for by the directors or its executive committee. Upon the facts found by the master we think it must be held that this subscription was accepted by the corpo-

ration. Nothing ever was paid upon these subscriptions; no call for any payment thereon ever was made either by the directors or the executive committee; nor was any certificate of shares or other acknowledgment ever issued to the subscribers, nor was the subscription paper ever seen by the plaintiffs, nor were the plaintiffs informed of this subscription by any one of the subscribers.

The directors met on December 8, 1894, and, after transacting some business the nature of which is set forth in the master's report, adjourned to January 1, 1895, on which day it was voted that the regular annual meeting of the corporation be called in accordance with the by-laws for Monday, January 14, 1895, for the purpose of electing officers and transacting such other business as might come before the meeting. Notice of this meeting was given by the clerk to all the incorporators and stockholders. Before this annual meeting the plaintiffs resigned as directors under the circumstances stated in the report. Although they attempted to recall their resignations and were present at the meeting, yet a vote was then passed declining to permit the withdrawal of the resignations. They made no further attempt to act as directors, and upon the facts found by the master it is clear that they were no longer directors and that such was the understanding of all concerned. While present at this meeting the plaintiffs heard it described by Towle and at least some of the other defendants, as a stockholders' meeting; and indeed the vote declining to permit the withdrawal of the plaintiffs' resignations shows that stockholders were voting as such and that the question was decided in the negative by a stock vote. This annual meeting was adjourned several times, and it is clear from the facts stated in the master's report that it was regarded as a stockholders' meeting. Indeed, at the adjourned meeting held on March 30, 1895, at which were present six of the defendants, seven directors were elected by a stock vote. The annual meeting then adjourned without day. On March 30, 1895, immediately after the meeting, the directors met, elected officers, and adjourned to December 9, 1895.

At a meeting of the directors of the corporation held on February 6, 1895, the following vote was passed: "Voted that whereas the company is in need of funds and whereas the

amount of stock offered for subscription, to wit: $500,000 has
not yet been subscribed, that the clerk be directed to issue a
notice to each of the stockholders and each of the incorpora-
tors of this company, notifying them that the books of the com-
pany will be open to receive subscriptions to the capital stock
until February 16, 1895, and requesting them to forward their
subscriptions."

In pursuance of this vote the clerk of the corporation sent to
each of the original thirteen incorporators a notice as follows:
" Boston, Feb. 8, 1895.   Dear Sir: This is to notify you that
the books open for subscription to the capital stock of the
Boston Elevated Railway Company, will be closed on February
16, 1895, at two o'clock P. M.   Subscriptions will be received at
any time in room 527 Exchange Building, Boston, Mass.   They
will be payable in such sums, and at such times as the directors
may order.   You are earnestly requested to forward your sub-
scription to the undersigned at the earliest possible moment.
Fred C. Patch, Clerk."

Neither of the plaintiffs ever subscribed for stock, nor did
either see Towle after the annual meeting in Boston on January
14, 1895.   There was however some correspondence between
them the nature of which is fully set forth in the master's
report.   The substance of it is that the plaintiffs declined to
undertake the " financing of the securities of the company " un-
less " the whole thing could be turned over to us."

It is unnecessary to recite further in detail the facts set forth
in the report as to the state of the corporation in December,
1895, the time at which the contracts with Morgan were made.
The charter had been granted and accepted, by-laws had been
passed, officers elected and the corporation had been organized.
Stock had been subscribed for and the subscriptions had been
accepted.   Although the amount subscribed was only a very
small part of the stock, yet the annual meeting of the stock-
holders had been held in accordance with the by-laws of the
corporation and directors had been elected by a stock vote.
The plaintiffs, although requested, had declined to subscribe
for the stock.   In a word, the corporation had passed through
its birth throes and was breathing with its own lungs.

Under these circumstances Morgan appeared upon the scene

with a desire to get the control of the corporation. Had the stock been all subscribed for or issued he could have got control by the purchase of a majority of the stock. But only a small part had been subscribed for. Where rested the franchise? Was it in the incorporators or in the corporation?

There are various ways in which a corporation may be organized; and of course the relations which the persons specifically named in the statute granting a franchise sustain to the franchise or to the corporation, either before or after its organization, depend largely upon the statute. Sometimes the statute names certain persons who as public officers call for subscriptions to the stock of the corporation and when the whole stock is subscribed call a meeting of the subscribers to organize the corporation, at which meeting the organization is effected by the subscribers. In such a case the persons specifically named in the statute act all the way through as public officers and as such have no interest whatever either in the franchise or in the corporation. A good illustration of such a state of things is to be found in *State* v. *Bull*, 16 Conn. 179.

Sometimes the petitioners for an incorporation have already associated themselves together with others as subscribers to stock, and in the statute the franchise is given to one or more of the petitioners named specifically and their associates. This formerly was a very common way of granting a franchise. Especially in the case of an application for a bank of deposit and discount was it the practice for the applicants to inform the Legislature who were the subscribers in order that it might be seen whether they were proper persons to receive a charter. This practice is alluded to in *Lechmere Bank* v. *Boynton*, 11 Cush. 369. Sometimes, at the time the charter is granted, there are no subscribers for the stock. In such a case the word " associates " may mean those who were associated as petitioners with the persons specifically named in the act. The question as to who were entitled to a franchise and who could organize a corporation was very fully considered in *Lechmere Bank* v. *Boynton, ubi supra*. In that case (decided in 1853) there was a question as to which of two classes of persons were entitled to organize the corporation.

We do not find it necessary to consider further the various

methods of creating corporations by a special charter and of setting them at work, because we are of opinion that the question of the ownership of the franchise is settled by St. 1855, c. 140, afterward Pub. Sts. c. 105, § 9, now R. L. c. 109, § 13. The statute was passed probably to avoid some such difficulties as were disclosed in *Lechmere Bank* v. *Boynton,* 11 Cush. 369. See *Newcomb* v. *Reed,* 12 Allen, 362, 364. By the terms of that statute the persons named in the act of incorporation " and their associate subscribers to stock before the date of the act shall hold the franchises or privileges granted until the corporation is organized." In the case before us it does not appear that there were any subscribers to the stock before the date of the act of incorporation. The franchise therefore was held by the thirteen incorporators specifically named therein. It is necessarily implied in the act that the franchise does not remain in the incorporators after the corporation is organized; and we are of opinion that within the meaning of this statute and for the transfer of the franchise the corporation must be regarded as organized when the first meeting has been called, the act of incorporation accepted, the officers elected and by-laws providing for future meetings adopted, at least where there are any stockholders. Rev. Sts. c. 44, §§ 3, 5. St. 1855, c. 140. Pub. Sts. c. 105, §§ 9, 12. *Braintree Water Co.* v. *Braintree,* 146 Mass. 482. *McGinty* v. *Athol Reservoir Co.* 155 Mass. 183. Under the circumstances disclosed in this case it must be held therefore that the franchise was in the corporation at the time of the contracts with Morgan. The incorporators as such had no further interest in the franchise or the property of the corporation, and, after the acceptance of stock subscriptions, had no further power in its management. The interests of the corporation including its franchise were the property of the stockholders as such, and were to be cared for by the officers acting as the agents of the corporation and subject to the will of the stockholders; and that was so even if only a very small fractional part of the stock had been subscribed for and accepted, and although no payments had been made thereon, none having been duly called.

When Morgan arrived upon the scene the situation was this. The corporation had been fully organized, so far at least as to

hold the franchise, the control of which was the thing which he desired to get. The affairs of the corporation were being managed by its officers, holding their respective offices at the will of the stockholders. Each stockholder could dispose of his right to the stock as he saw fit. In this respect he sustained no fiduciary relation to any other stockholder, much less to any incorporator, nor was he under any legal obligation to look out for the interest of any other stockholder or of any incorporator. Moreover in this particular case the plaintiffs had been solicited to become stockholders and after being fully notified of the time in which the subscription books would be closed had failed to subscribe. And this is not all. Although requested so to do, they had declined to make any attempt to finance the securities of the corporation unless they could be put in full control; and after the annual meeting of January 14, 1895, at which they were not permitted to withdraw their respective resignations as directors, they did not attend any meeting of the directors or of the corporation, nor, so far as disclosed by the report, did they have anything further to do with the enterprise. Under these circumstances whether or not the defendants owed them any moral duty is not here material. Certainly there was no legal duty.

In this state of affairs the person who could get the rights of a majority of the stock could control the corporation. Upon an examination of the contracts made with each of the defendants, they being all of the stockholders, it will appear that no one of the defendants undertook to sell anything but his own individual interest. Each transferred to one Baldwin acting for Morgan " all the right, title and interest I have in and to the Boston Elevated Railway Company, either as one of the incorporators or otherwise, and also all stock or right to stock which I have therein, and all claims which I have against said company, of every name and nature." Each also irrevocably appointed Baldwin a representative of Morgan to be his attorney in fact, with full power " to be present at any meeting which may be held of the incorporators of said Boston Elevated Railway Company, and in my name and stead to . . . do and perform any and all acts or things, whatsoever, which I, as one of said incorporators, may or shall have the right to do or perform." As a part of the un-

derstanding with Morgan each of the defendants subsequently resigned his official position, and the nominees of Morgan were elected to fill vacancies. The defendants also assigned to Morgan all bills they had against the corporation; and two of the defendants, Towle and Whittier, agreed that they would pay or cause to be paid, satisfied and discharged at their own expense, "any claims, indebtedness, contracts or obligations of said company" other than those thus assigned. In a word, these defendants assigned all their respective interests in the company as incorporators or stockholders, all their claims as creditors, and resigned their offices to be filled under the by-laws by the nominees of Morgan. Under the circumstances this gave to Morgan the control of the franchise, just as before the sale the control had been in them. They did not sell any interest possessed by the plaintiffs. In any event the interest of the plaintiffs, if any they had, was not affected in any way whatever. If Morgan had gained the control, he had gained it because he had bought the right to stand in the place of the persons who at the time of the contracts were in control. If after the contracts the plaintiffs were not in control it was not because anything belonging to them had been transferred to Morgan, but because they were not in control at the time the contracts were made. They were in no worse or better condition than before. Their relation to the franchise and to the corporation was in no way changed either in law or equity.

This is not a case where some of several joint owners have undertaken to sell the whole interest in the property held in joint ownership, and where the owners not concerned in the sale can ratify the sale and look to their fraudulent associates for their share. Nor is it a case where promoters bearing a fiduciary relation to the corporation of their own creation attempt to defraud it by conveying to it at an exorbitant price property in which they have an interest adverse to the corporation, as was the situation in *Old Dominion Copper Mining & Smelting Co.* v. *Bigelow*, 188 Mass. 315. Nor is it a case like *Hayward* v. *Leeson*, 176 Mass. 310, where promoters have caused to be issued to themselves a large part of the capital stock for their remuneration in fraud of subsequent stockholders subscribing for the stock in ignorance of that fact.

There has been no fraud committed upon the corporation. It and all subsequent stockholders stand as before. It is true that bills were made out by Towle against the corporation for a large sum; and it is contended by the plaintiffs that these were made out and assigned to Morgan for the express purpose of defrauding them, but the master finds that this contention is not sustained by the evidence.

The nature of the transaction is well set out in the master's report in the following language: " As to the claim of the plaintiffs that the seven vendors sold and transferred on December 9 and 11, the entire charter of the Boston Elevated Railway Company to Morgan, and that Morgan paid to the vendors the full value of said charter, it is true that Towle, Meigs, and Spaulding, referred at different times to the transaction as a sale of the charter. It was shown, also, that in the spring of 1896 the banker defendants issued a circular to the stockholders of the West End Street Railway Company which contained the statement, ' We bought 'jointly the Boston Elevated Railway Company charter.' Notwithstanding the fact that the transfers to Morgan were thus described or referred to at different times as a sale of the charter, I find that the real transaction was that the seven vendors, constituting together all the stockholders of the corporation, or, if they were not stockholders, a majority of all the incorporators thereof, and constituting also the entire board of directors of the company, transferred to Morgan all their stock, if stock it was, and all their rights as incorporators, with the result that Morgan acquired all the rights and control which they had collectively, whether that of stockholders or incorporators, together with whatever claims they had against the corporation, and that Morgan paid said consideration for such transfers, together with the resignations of the seven vendors as directors and officers and the substitution of Morgan's nominees as directors and officers to fill the vacancies thus caused. After the arrangement between Morgan and the seven vendors had been consummated the plaintiffs continued to stand in the same legal relation to the corporation, and to possess the same legal rights as incorporators thereof, as before the transfer."

The rulings of the master were correct, and the exceptions to the report are overruled. Under the terms of the reserva-

tion there must be judgment for the defendants with costs; and it is

*So ordered.*

*R. M. Morse,* (*W. P. Everts* with him,) for the plaintiff.

*S. K. Hamilton,* (*T. Eaton* with him,) for William Spalding.

*W. Howland, pro se,* and for Charles A. Whittier, administrator.

*H. N. Allin,* for Joe V. Meigs.