Marcus G. Christ, J.
This is a stockholders’ derivative and representative action brought by two stockholders of the Prosperity Company (hereinafter sometimes referred to as “Prosperity”), a domestic corporation engaged in the business of manufacturing commercial laundry equipment. The individual defendants are former directors, officers and stockholders of Prosperity who were in control of Prosperity at the time of the transaction of which the plaintiffs complain.
The amended complaint alleges that the individual defendants, as officers, directors and owners of the controlling stock of Prosperity, in breach of their fiduciary duties sold their entire stock to a purchasing group dominated by two individuals for a price which, plaintiffs allege, exceeded the fair value of the stock by $800,000. Plaintiffs allege further that the excess of the consideration above the fair value of the stock was paid for the resignations of the individual defendants and their nominees as directors and officers of Prosperity and the election of the purchasers’ nominees in their place. It is further alleged that at the time of the sale the individual defendants knew that two members of the purchasing group ‘ ‘ had previously looted ” Prosperity for their own personal benefit and ‘1 otherwise breached their trust while directors to the damage of Prosperity and its stockholders ” and knew that these two individuals had been charged with dereliction of fiduciary duties in litigations then and still pending. A judgment is sought directing the individual defendants to account for and pay over to the plaintiffs and all other stockholders similarly situated or to Prosperity the difference between the fair value of the stock sold and all the consideration received therefor. In the third cause of action plaintiffs seek to enjoin Prosperity from employing the defendant, G. A. Braun, from recognizing or paying any claim of G. A. Braun, Inc. and from recognizing any claim of P. N. Braun, Inc., it being alleged that the pur *69 chasing group, in conjunction with its purchase of the controlling stock, agreed that when they obtained control of Prosperity they would cause resolutions to be passed employing G-. A. Braun as a consultant and recognizing the claims above mentioned. The amended complaint differs from the original complaint only in that it contains a third cause of action which was not present in the original complaint. The original complaint was sustained as legally sufficient (Benson v. Braun, 141 N. Y. S. 2d 286, affd. 286 App. Div. 1098).
The liability of controlling stockholders for profit arising from the sale of stock has been frequently considered by the courts and legal commentators (Gerdes v. Reynolds, 28 N. Y. S. 2d 622; Insuranshares Corp. of Delaware v. Northern Fiscal Corp., 35 F. Supp. 22; Levy v. American Beverage Corp., 265 App. Div. 208; Stanton v. Schenck, 140 Misc. 621; Perlman v. Feldmann, 219 F. 2d 173; see, n., “ Restrictions on the Transfer of Controlling Stock”, 40 Va. L. Rev. 195 [1954]; n., 68 Harv. L. Rev. 1274 [1955]; n., 40 Cornell L. Q. 786 [1955] ; n., 22 U. of Chicago L. Rev. 895 [1955]; n., 54 Mich. L. Rev. 399 [1956]). The general rule is that a stockholder may dispose of his stock at any time and at such price as he chooses. Recognition is given to the fact that the advantages which flow from control of a corporation may make the price paid for controlling shares greater than that paid for other shares (Levy v. American Beverage Corp., supra, Stanton v. Schenck, supra). However, the freedom of a controlling stockholder to dispose of his stock has been restricted to reduce the possibility of injustice being done to other stockholders or the corporation. The purpose of the rules restricting transfers of controlling interests is to prevent transactions tainted with bad faith, intent to defraud or negligence on the part of those possessing control. In the absence of such elements it is desirable that control of a corporation be readily transferable “ so that persons with ideas for improving a business might be able to put their ability to work” (see, n., 40 Va. L. Rev. 195, 208). When ownership of controlling stock changes hands, a change in the board of directors is generally expected (see Farmers’ Loan & Trust Co. v. New York & Northern Ry. Co., 150 N. Y. 410, 425). It is true that officers and directors may normally resign from office when they please (see Bruce v. Platt, 80 N. Y. 379, 383; Gerdes v. Reynolds, supra, p. 649). Thus it is legitimate for those selling controlling shares, in connection with the sale of their stock, to resign as directors and to use their influence to bring about resignation by a majority of the board so as to facilitate the taking over of control by the *70 purchasers. However, officers and directors may not resign their offices and elect as their successors persons who they knew intended to loot the corporation’s treasury (Gerdes v. Reynolds, supra, p. 652). Nor may they resign in consideration of the payment of a secret bonus (Porter v. Healy, 244 Pa. 427). Such action is regarded as an abuse of power, a misuse of corporate office and a breach of a fiduciary duty owed to the corporation or its stockholders (Gerdes v. Reynolds, supra; Porter v. Healy, supra; Insuranshares Corp. of Delaware v. Northern Fiscal Corp., supra).
Plaintiffs claim a breach of fiduciary duty by the individual defendants because they sold controlling stock to a purchasing group which included A. B. Braun and S. G. Braun. It is claimed by plaintiffs that the individual defendants knew that these men “had previously looted ” the corporation for their own personal benefit and ‘ ‘ had otherwise breached their trust while directors to the damage of Prosperity and its stockholders ”. The individual defendants are also charged with knowledge that A. B. Braun and S. G. Braun were accused of dereliction of fiduciary duties to the corporation, such accusations having been put forth in stockholders’ suits pending at the time of the sale.
The evidence upon the trial of this action does not sustain plaintiffs’ claims. There was no evidence establishing in fact that A. B. Braun and S. G. Braun “ had previously looted ” the corporation or that they ‘ ‘ had otherwise breached their trust while directors ” of Prosperity. All that has been proved is that certain members of the selling group had made charges during a proxy fight that A. B. Braun and S. G. Braun had illegally diverted corporate funds and that actions had been brought for the purpose of compelling an accounting for the funds allegedly diverted. On this phase of their case, plaintiffs have failed to establish that the individual defendants sold to persons who they knew “ had previously looted ” the corporation and who ‘1 had otherwise breached their trust while directors ”. The sellers could only know that which was established as a fact. At the time of the sale it had not been factually established that A. B. Braun and S. G. Braun were guilty of the wrongdoing with which they had been accused. Even up to the time of the trial of this action such charges remained charges and had not been factually established in the lawsuits predicated upon them.
It is claimed by the plaintiffs that the price received by the sellers was greatly in excess of the fair value of the stock and that the excess above the fair value was naid for the resig *71 nations of the sellers and their nominees as officers and directors and the election of nominees of the purchasers in their place. None of the documents which evidence the agreement to sell the controlling stock mention resignations of the sellers and their nomineees. The evidence does not establish that the matter of resignations was the subject of negotiation or agreement. That the purchasers of the controlling interest expected such resignations to occur appears highly probable. It appears similarly probable that the sellers expected or assumed that their resignations would be requested. Such expectations or assumptions cannot be equated with the bartering of corporate offices which the law forbids. The question then becomes one of determining whether the price paid for the stock is so great that it can be explained in no other way than as a payment for resigning from office.
Determination of the value of stock involves consideration of numerous factors. Market value, book value, capitalization of earnings are all important elements in this process. But they are not singly or in the aggregate the sole criteria in determining stock value. It is trite but true to say that each corporation whose stock is evaluated must be viewed in relation to the facts peculiar to that particular enterprise. In this case factors were present which could well have been taken into account and have led to establishing a selling price well above the market quotations on the corporation’s one listed stock. That listed stock did not possess power to vote on the election of directors and was not the stock involved in the sale of control. There was some evidence adduced by the plaintiffs that the value of the listed stock (Class B) as reflected in the market quotations was substantially the same as that of the Class A stock which was unlisted and involved in the sale to which this suit relates. It is true that the price paid was above the market price prior to and at the time of sale, but shortly thereafter the market price went far above the price paid for the stock and has not gone below it. All of which indicates that the stock had a true value not indicated by the market.
There is evidence tending to show that the real property of Prosperity had a very considerable appreciation in value not reflected on the books of the corporation. Increased value by virtue of appreciation is recognized as a valid corporate accounting principle (cf. Randall v. Bailey, 288 N. Y. 280). The purchasing group included persons who recently had occupied positions as officials of the corporation. Such positions within the corporation could be expected to give them knowl *72 edge of the enhanced value of fixed assets not readily discernible to outsiders evaluating the stock on the basis of data generally available.
The evidence shows that although one of its three classes of stock was listed on the stock exchange, this corporation had been essentially a family enterprise with control centered in the hands of five members of the Braun family. Until 1953 the management of the corporation had been dominated and controlled by this family group through pooling of the voting power of the stock holdings of its members. Dissension within this small family group led to creation of two family factions referred to by the parties as the “ A. R. Faction ” (a group headed by A. R. Braun) and the “ G-. A. Faction ” (a group headed by Grains A. Braun). The Gr. A. Faction, by refusing to combine its voting power with the A. R. Faction, succeeded in ousting the A. R. Faction from control of the board of directors and subsequently ousted A. R. Braun from his long-held position of president of the corporation. This led to a proxy fight in which the Gr. A. Faction defeated the A. R. Faction’s bid for a return to power in management of corporate affairs. That this family fight was bitter is beyond doubt. During it, charges and countercharges of wrongdoing were made. This led to stockholders’ suits which are still pending as well as a libel action brought by A. R. Braun against some members of the Gr. A. Faction who had charged him with wrongdoing.
It was in this corporate climate that the proposal to purchase the stock of the Gr. A. Faction came into being. The elimination of deepseated and apparently irreconcilable dissension among those most actively identified with control of Prosperity’s affairs is an element which the purchasing group might well take into account. An end to such dissension could be viewed as opening the way for increased efficiency of corporate operations and make possible formulation and execution of policies free from the handicap of internal wrangling. The purchasing group was not made up of persons who were strangers to the corporation but included men who, until their recent descent from power, had been in active control and management of Prosperity’s affairs. Their intimate knowledge of the internal workings of the enterprise may be assumed to carry an appreciation of the possibilities for growth value in the stock of Prosperity. Far from the least of the factors to be considered in assessing possibilities for growth value is that of management. Moreover, the type of business in which this corporation was engaged is a matter of importance. In the *73 search for reasons to explain the apparently high price paid for controlling stock, it is proper to inquire whether there were distinctive features of the corporation which might influence a purchaser to pay such a price. This was noted in Gerdes v. Reynolds (supra) where the court took pains to point out the “ almost complete lack of any distinctiveness in the assets of the company ”. The court (p. 657) commented: “ It owned no land of special adaptability — in fact, no land at all. It owned no plant or structures or machinery which would take a long time to assemble. It had no clientele or customers, the mere existence of which sometimes gives great value to the stock of a company. It had no specially trained personnel or organization of any kind. * * * Therefore, with the exception of its holdings in United States Foil and Reynolds Metals Company, its entire assets could have been substantially duplicated by anyone in a very few days, by the simple device of giving some buying orders to a broker.”
The court in the last-cited case thus was able to exclude distinctiveness of corporate assets as a factor which could account for the high price paid for the controlling stock, but at the same time the court recognized that the situation might well be different in the case of an industrial plant and made this observation (p. 658): “ The situation thus bore not the slightest resemblance to a railway, public utility, or industrial plant, or any other assemblage of tangible assets, going business, and trained organisation, where there is room for wide divergence of honest and reasonably entertained opinion as to what wonders may be worked by a sagacious buyer who places himself in control.” (Italics supplied.)
Finally, the court must note the absence of any harm to Prosperity or its stockholders from the transfer of the controlling stock. The rules restricting free alienability of controlling stock have been developed, as earlier noted, to prevent injury and injustice to the corporation and its stockholders. "When these restrictive rules have been applied their thrust has been at those found to be responsible for injury to the corporation, its shareholders or creditors. The transfer of control was followed by actual looting of the corporation, or the corporation was deprived of a business opportunity, or shareholders were induced to part with their stock at prices unjustifiably lower than the price received by the sellers of control. Here no damage was done to the corporation and no injury was caused to the stockholders or creditors. In fact, the post-sale record of the corporation was one of continuing prosperity. Control of the corporation soon passed into the hands of a *74 group different from either the seller or purchaser group involved in this litigation.
From a consideration of all the evidence in this case the court concludes that plaintiffs have failed to sustain the burden of proof by a fair preponderance of the evidence and judgment is accordingly awarded in favor of the defendants dismissing the amended complaint, together with the costs and disbursements of the action to the individual defendants only. This constitutes the decision of the court pursuant to section 440 of the Civil Practice Act. Settle judgment on notice.