ESSEX UNIVERSAL CORPORATION, Appellant,

v.

Herbert J. YATES, Appellee.

No. 196, Docket 27073.

United States Court of Appeals Second Circuit.

Argued Jan. 12, 1962.

Decided June 28, 1962.

Walter S. Beck, New York City (Albert F. Smith, Phillips, Nizer, Benjamin, Krim & Ballon, New York City, on the brief), for appellant.

Max Freund, New York City (Ambrose Doskow, Ernest A. Gleit, Rosenman Colin Kaye Petschek & Freund, New York City, on the brief), for appellee.

Before LUMBARD, Chief Judge, and CLARK and FRIENDLY, Circuit Judges.

LUMBARD, Chief Judge.

This appeal from the district court's summary judgment in favor of the defendant raises the question whether a contract for the sale of 28.3 per cent of the stock of a corporation is, under New York law, invalid as against public policy solely because it includes a clause giving the purchaser an option to require a majority of the existing directors to replace themselves, by a process of seriatim resignation, with a majority designated by the purchaser. Despite the disagreement evidenced by the diversity of our opinions, my brethren and I agree that such a provision does not on its face render the contract illegal and unenforceable, and thus that it was improper to grant summary judgment. Judge Friendly would reject the defense of illegality without further inquiry concerning the provision itself (as distinguished from any contention that control could not be safely transferred to the particular purchaser). Judge Clark and I are agreed that on remand, which must be had in any event to consider other defenses raised by the pleadings, further factual issues may be raised by the parties upon which the legality of the clause in question will depend; we disagree, however, on the nature of those factual issues, as our separate opinions reveal. Accordingly, the grant of summary judgment is reversed and the case is remanded for trial of the question of the legality of the contested provision and such further proceedings as may be proper on the other issues raised by the pleadings.

Since we are in agreement on certain preliminary questions, this opinion constitutes the opinion of the court up to the point where it is indicated that it thenceforth states only my individual views.

The defendant Herbert J. Yates, a resident of California, was president and chairman of the board of directors of Republic Pictures Corporation, a New York corporation which at the time relevant to this suit had 2,004,190 shares of common stock outstanding. Republic's stock was listed and traded on the New York Stock Exchange. In August 1957, Essex Universal Corporation, a Delaware corporation owning stock in various diversified businesses, learned of the possibility of purchasing from Yates an interest in Republic. Negotiations proceeded rapidly, and on August 28 Yates and Joseph Harris, the president of Essex, signed a contract in which Essex agreed to buy, and Yates agreed "to sell or cause to be sold" at least 500,000 and not more than 600,000 shares of Republic stock. The price was set at eight dollars a share, roughly two dollars above the then market price on the Exchange. Three dollars per share was to be paid at the closing on September 18, 1957 and the remainder in twenty-four equal monthly payments beginning January 31, 1958. The shares were to be transferred on the closing date, but Yates was to retain the certificates, endorsed in blank by Essex, as security for full payment. In addition to other provisions not relevant to the present motion, the contract contained the following paragraph:

"6. Resignations.

Upon and as a condition to the closing of this transaction if requested by Buyer at least ten (10) days prior to the date of the closing:

(a) Seller will deliver to Buyer the resignations of the majority of the directors of Republic.

(b) Seller will cause a special meeting of the board of directors of Republic to be held, legally convened pursuant to law and the by-laws of Republic, and simultaneously with the acceptance of the directors' resignations set forth in paragraph 6(a) immediately preceding will cause nominees of Buyer to be elected directors of Republic in place of the resigned directors."

Before the date of the closing, as provided in the contract, Yates notified Essex that he would deliver 566,223 shares, or 28.3 per cent of the Republic stock then outstanding, and Essex formally requested Yates to arrange for the replacement of a majority of Republic's directors with Essex nominees pursuant to paragraph 6 of the contract. This was to be accomplished by having eight of the fourteen directors resign seriatim, each in turn being replaced by an Essex nominee elected by the others; such a procedure was in form permissible under the charter and by-laws of Republic, which empowered the board to choose the successor of any of its members who might resign.

On September 18, the parties met as arranged for the closing at Republic's office in New York City. Essex tendered bank drafts and cashier's checks totalling $1,698,690, which was the 37½ per cent of the total price of $4,529,784 due at this time. The drafts and checks were payable to one Benjamin C. Cohen, who was Essex' banker and had arranged for the borrowing of the necessary funds. Although Cohen was prepared to endorse these to Yates, Yates upon advice of his lawyer rejected the tender as "unsatisfactory" and said, according to his deposition testimony, "Well, there can be no deal. We can't close it."

Essex began this action in the New York Supreme Court, and it was removed to the district court on account of diversity of citizenship. Essex seeks damages of $2,700,000, claiming that at the time of the aborted closing the stock was in actuality worth more than $12.75 a share.[1] Yates' answer raised a number of defenses, but the motion for summary judgment now before us was made and decided only on the theory that the provision in the contract for immediate transfer of control of the board of directors was illegal *per se* and tainted the entire contract. We have no doubt, and the parties agree, that New York law governs.

Appellant's contention that the provision for transfer of director control is separable from the rest of the contract can quickly be rejected. We see no significance in the fact that the contract gave Essex only an option to have the directors replaced, rather than providing directly for such a transfer of control, and the most elementary application of the parol evidence rule forbids us to entertain Essex' argument that there is a factual issue as to whether the transfer clause was central to the negotiations or only an afterthought.

On the face of the contract the sale of stock and the transfer of director control are but two aspects of a single transaction; the provision for the latter in paragraph 6 states that it is to be "a condition to the closing of this transaction." A matter so practically important as achieving immediate rather than deferred acquisition of control over the day-to-day operations of the corporation in which Essex was making such a substantial investment cannot be dismissed as a mere "incidental provision."

The terms of the contract thus express the unwillingness of Essex to pay the agreed price if Yates did not bring about the transfer of directorships, and surely no court would have forced it to make payment in that event. Since Yates could thus not have chosen to excise the hypothetically illegal term of the contract to make the provision for the sale of stock enforceable, it would be unjust to allow Essex the option of waiving it to

[1] In 1959, while this action was pending, the stock was sold to another party for ten dollars a share.

make the sale enforceable should it suit its purposes to do so. See 6 Corbin, Contracts § 1521 at 1006 (1951).

■ We are strongly influenced by those New York cases holding invalid agreements to sell stock because accompanied by illegal agreements for the transfer of management control, even though they contain no indication that the issue of separability was explicitly raised. See Manson v. Curtis, 223 N.Y. 313, 119 N.E. 559 (1918); Fennessy v. Ross, 90 Hun 298, 35 N.Y.S. 868; 5 App. Div. 342, 39 N.Y.S. 323 (1st Dept. 1896).[2] Accordingly, we hold the provision regarding directors inseparable from the sale of shares, and proceed to a consideration of its legality.

Up to this point my brethren and I are in agreement. The following analysis is my own, except insofar as the separate opinions of Judges Clark and Friendly may indicate agreement.

It is established beyond question under New York law that it is illegal to sell corporate office or management control by itself (that is, accompanied by no stock or insufficient stock to carry voting control). McClure v. Law, 161 N.Y. 78, 55 N.E. 388 (1899); Ballantine v. Ferretti, 28 N.Y.S.2d 668, 678–680 (N.Y. County Sup.Ct.1941); see Manson v. Curtis, 223 N.Y. 313, 119 N.E. 559 (1918). The same rule apparently applies in all jurisdictions where the question has arisen. E. g., Guernsey v. Cook, 120 Mass. 501 (1876); Reed v. Catlett, 228 Mo.App. 109, 68 S.W.2d 734 (1934); see Hill, The Sale of Controlling Shares, 70 Harv.L.Rev. 986, 998 (1957); Berle, "Control" in Corporate Law, 58 Colum. L.Rev. 1212 (1958). The rationale of the rule is undisputable: persons enjoy-

ing management control hold it on behalf of the corporation's stockholders, and therefore may not regard it as their own personal property to dispose of as they wish.[3] Any other rule would violate the most fundamental principle of corporate democracy, that management must represent and be chosen by, or at least with the consent of, those who own the corporation.

Essex was, however, contracting with Yates for the purchase of a very substantial percentage of Republic stock. If, by virtue of the voting power carried by this stock, it could have elected a majority of the board of directors, then the contract was not a simple agreement for the sale of office to one having no ownership interest in the corporation, and the question of its legality would require further analysis. Such stock voting control would incontestably belong to the owner of a majority of the voting stock, and it is commonly known that equivalent power usually accrues to the owner of 28.3% of the stock. For the purpose of this analysis, I shall assume that Essex was contracting to acquire a majority of the Republic stock, deferring consideration of the situation where, as here, only 28.3% is to be acquired.

Republic's board of directors at the time of the aborted closing had fourteen members divided into three classes, each class being "as nearly as may be" of the same size. Directors were elected for terms of three years, one class being elected at each annual shareholder meeting on the first Tuesday in April. Thus, absent the immediate replacement of directors provided for in this contract, Essex as the hypothetical new majority shareholder of the corporation could not have obtained managing control in the

2. This is not, like Central N. Y. Tel. & Tel. Co. v. Averill, 199 N.Y. 128, 92 N.E. 206, 32 L.R.A.,N.S., 494 (1910), a case where a substantial investment by the plaintiff in reliance upon the contract and partial performance by him would make it inequitable to deny all enforcement of the contract; moreover, there is no indication in that case that the parties explicitly chose to make the allegedly illegal term an inextricable part of the transaction, as Essex and Yates did in their contract.

3. The cases have made no distinction between contracts by directors or officers to resign and contracts by persons who in actuality control the actions of officers or directors to procure their resignations, and of course none should exist.

form of a majority of the board in the normal course of events until April 1959, some eighteen months after the sale of the stock. The first question before us then is whether an agreement to accelerate the transfer of management control, in a manner legal in form under the corporation's charter and by-laws, violates the public policy of New York.

There is no question of the right of a controlling shareholder under New York law normally to derive a premium from the sale of a controlling block of stock. In other words, there was no impropriety *per se* in the fact that Yates was to receive more per share than the generally prevailing market price for Republic stock. Levy v. American Beverage Corp., 265 App.Div. 208, 218, 38 N.Y.S.2d 517, 526 (1st Dept. 1942); Stanton v. Schenck, 140 Misc. 621, 251 N.Y.S. 221 (N.Y.County Sup.Ct.1931); see Hill, supra, 70 Harv. L.Rev. at 991–92.

The next question is whether it is legal to give and receive payment for the immediate transfer of management control to one who has achieved majority share control but would not otherwise be able to convert that share control into operating control for some time. I think that it is.

Of course under some circumstances controlling shareholders transferring immediate control may be compelled to account to the corporation for that part of the consideration received by them which exceeds the fair value of the block of stock sold, as well as for the injury which they may cause to the corporation. In Gerdes v. Reynolds, 28 N.Y.S.2d 622 (N.Y.County Sup.Ct.1941), the purchasers of control of an investment company proceeded immediately to loot the corporation of its assets, and the court required the sellers to account on the theory that the circumstances of the sale put them on notice of the buyers' evil intentions. The court found the price paid grossly in excess of the calculable fair value of a controlling interest in the corporation, and found the differential to be payment for the immediate control which,

foreseeably, the buyers used to the detriment of the corporation and its other shareholders. A very nearly identical case, Insuranshares Corp. v. Northern Fiscal Corp., 35 F.Supp. 22 (E.D.Pa. 1940), in which the court did not find it necessary to decide whether the law of New York or some other jurisdiction applied, reached a similar result. And in Bosworth v. Allen, 168 N.Y. 157, 61 N.E. 163, 55 L.R.A. 751 (1901), the New York Court of Appeals, although technically deciding no more than that joinder of claims was proper, indicated strongly that it felt that a good cause of action was stated by a complaint alleging substantially similar circumstances.

In Perlman v. Feldmann, 219 F.2d 173, 50 A.L.R.2d 1134 (2 Cir.), cert. denied, 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955), this court, in a decision based only nominally on Indiana law, went beyond this rule to hold liable controlling shareholders who similarly sold immediate control even in the absence of illegitimate activity on the part of the purchasers. Our theory was basically that the controlling shareholders in selling control to a potential customer had appropriated to their personal benefit a corporate asset: the premium which the company's product could command in a time of market shortage. Porter v. Healy, 244 Pa. 427, 91 A. 428 (1914), may similarly be explained as "condemning * * * a personal profit derived by the insiders in a liquidation situation involving in substance the sale of the corporation's assets. * * *" Hill, supra, 70 Harv.L. Rev. at 1000–01.

A fair generalization from these cases may be that a holder of corporate control will not, as a fiduciary, be permitted to profit from facilitating actions on the part of the purchasers of control which are detrimental to the interests of the corporation or the remaining shareholders. There is, however, no suggestion that the transfer of control over Republic to Essex carried any such threat to the interests of the corporation or its other shareholders.

Our examination of the New York cases discussed thus far gives us no reason to regard as impaired the holding of the early case of Barnes v. Brown, 80 N.Y. 527 (1880), that a bargain for the sale of a majority stock interest is not made illegal by a plan for immediate transfer of management control by a program like that provided for in the Essex-Yates contract. Judge Earl wrote:

> "[The seller] had the right to sell out all his stock and interest in the corporation, * * * and when he ceased to have any interest in the corporation, it was certainly legitimate and right that he should cease to control it * * * It was simply the mode of transferring the control of the corporation to those who by the policy of the law ought to have it, and I am unable to see how any policy of the law was violated, or in what way, upon the evidence, any wrong was thereby done to anyone." 80 N.Y. at 537.

To be sure, in Barnes v. Brown no term of the contract of sale *required* the seller to effectuate the immediate replacement of directors, as did paragraph 6 of the Essex-Yates contract, but Judge Earl stated that "I shall assume that it was the understanding and a part of the scheme that he should do so." 80 N.Y. at 536. Although the court might have decided the case by pointing out that under the parol evidence rule either party could have ignored what was at best a collateral oral agreement for the replacement of directors and enforced the written contract for the sale of the stock as it read, it chose not to do so but explicitly upheld the legality of the transfer of directorships. Accord, Roosevelt v. Hamblin, 199 Mass. 127, 85 N.E. 98, 18 L.R.A.,N.S., 748 (1908); Perlman v. Feldmann, 129 F.Supp. 162, 187 (D.Conn. 1952), rev'd on other grounds, 219 F.2d 173 (2 Cir.), cert. denied 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955); Feuer,

Personal Liabilities of Corporate Officers and Directors 107 (1961).

Given this principle that it is permissible for a seller thus to choose to facilitate immediate transfer of management control, I can see no objection to a contractual provision requiring him to do so as a condition of the sale. Indeed, a New York court has upheld an analogous contractual term requiring the board of directors to elect the nominees of the purchasers of a majority stock interest to officerships. San Remo Copper Mining Co. v. Moneuse, 149 App.Div. 26, 133 N.Y.S. 509 (1st Dept. 1912). The court said that since the purchaser was about to acquire "absolute control" of the corporation, "it certainly did not destroy the validity of the contract that by one of its terms defendant was to be invested with this power of control at once, upon acquiring the stock, instead of waiting for the next annual meeting." 149 App. Div. at 28, 133 N.Y.S. at 511.

The district court in its opinion failed to mention Barnes v. Brown and San Remo Copper Mining Co. v. Moneuse, supra, and relied upon a number of cases which are distinguishable in terms of theories elaborated earlier in this discussion. Gerdes v. Reynolds, 28 N.Y.S.2d 622 (N. Y.County Sup.Ct.1941), as has been suggested, did no more than hold controlling shareholders who sold out to persons whose intentions they had reason to suspect to an accounting, after the fact. In both Fennessy v. Ross, 90 Hun 298, 35 N.Y.S. 868; 5 App.Div. 342, 39 N.Y.S. 323 (1st Dept. 1896), and Ballantine v. Ferretti, 28 N.Y.S.2d 668 (N.Y.County Sup.Ct.1941), management control was transferred to persons who were not also acquiring shareholder control; accordingly, no more than a bare sale of office was involved.[4] The same may have been the situation in Fremont v. Stone, 42 Barb. 169 (Sup.Ct. 1st Dist. 1864), where the court did not state whether the block of stock which was to accompany

---

4. A part of the Ballantine opinion not here relevant also held certain persons who conspired to loot one of the corporations involved liable for the assets they received and for the damages they caused to it.

the transfer of directorships amounted to share control or not. In any event, this trial court decision seems fairly to have been superseded by the Court of Appeals' later decision in Barnes v. Brown, supra; the Fremont v. Stone decision was there cited to the court, but was not mentioned in its opinion.

The most troublesome, and most recent, of the relevant New York decisions, one not cited below, is Benson v. Braun, 8 Misc.2d 67, 155 N.Y.S.2d 622 (Nassau County Sup.Ct.1956). That case was a derivative action by minority shareholders seeking to recover an alleged premium received by the sellers of a majority share interest for transferring control over the board of directors in the manner provided for in the Essex-Yates contract; there was, however, no such explicit contractual provision. The complaint, sustained earlier by the Appellate Division, 286 App.Div. 1098, 145 N.Y.S.2d 711 (2d Dept. 1955), alleged that this premium had been for the immediate transfer of control under circumstances raising a reasonable suspicion that the purchasers intended to loot the corporation. At the trial, the court found no reason for the sellers to have suspected looting, but went on to say that it was necessary to determine "whether the price paid for the stock is so great that it can be explained in no other way than as a payment for resigning from office." 8 Misc.2d at 71, 155 N.Y.S.2d at 627. Although the court found that the price could be justified in terms of the fair value of the stock, the fact that it made the inquiry suggests that the opposite factual conclusion would have resulted in liability. The court's approach may, however, be explained in terms of the principle, evolved earlier in this discussion, that an accounting will be required in any case where the transfer of control works to the detriment of the corporation or its other shareholders. The court pointed out the absence of any resultant harm, and stated that

"The rules restricting free alienability of controlling stock have been developed, as earlier noted, to prevent injury and injustice to the corporation and its stockholders. When these restrictive rules have been applied their thrust has been at those found to be responsible for injury to the corporation, its shareholders or creditors." 8 Misc.2d at 73, 155 N.Y.S.2d at 629.

The payment of a large premium for resigning (alleged to be $800,000 in Benson v. Braun) is, of course, relevant to the question whether the sellers had any reason for suspecting that the purchasers had improper intentions in acquiring control. See Gerdes v. Reynolds, 28 N.Y.S.2d 622, 658 (N.Y.County Sup.Ct. 1941). Such an interpretation best comports with the line of New York authority as we have traced it.

To be sure, § 16(a) of the Investment Company Act of 1940, 54 Stat. 813, 15 U.S.C.A. § 80a-16(a), prohibits replacement of more than one-third of the directors of a registered investment company other than by shareholder vote, and some authorities contend that the same principle should be enforced as to all corporations. Leech, Transactions in Corporate Control, 104 U.Pa.L.Rev. 725, 809 (1956); see Berle, supra, 58 Colum. L.Rev. at 1224. Investment companies, whose assets consist of more or less liquid securities, present a special temptation to looters, and in the judgment of Congress a special prophylactic rule is needed to protect shareholders from the consequences of secret transfers of management control. It is doubtful, however, that such a restriction is necessary or desirable in the case of an industrial corporation such as Republic; in any event, I can find no indication that the New York courts would impose it.

The easy and immediate transfer of corporate control to new interests is ordinarily beneficial to the economy and it seems inevitable that such transactions would be discouraged if the purchaser of a majority stock interest were required to wait some period before his purchase of control could become effective. Conversely it would greatly hamper the ef-

forts of any existing majority group to dispose of its interest if it could not assure the purchaser of immediate control over corporation operations. I can see no reason why a purchaser of majority control should not ordinarily be permitted to make his control effective from the moment of the transfer of stock.

Thus if Essex had been contracting to purchase a majority of the stock of Republic, it would have been entirely proper for the contract to contain the provision for immediate replacement of directors. Although in the case at bar only 28.3 per cent of the stock was involved, it is commonly known that a person or group owning so large a percentage of the voting stock of a corporation which, like Republic, has at least the 1,500 shareholders normally requisite to listing on the New York Stock Exchange,[5] is almost certain to have share control as a practical matter. If Essex was contracting to acquire what in reality would be equivalent to ownership of a majority of stock, i. e., if it would as a practical certainty have been guaranteed of the stock voting power to choose a majority of the directors of Republic in due course, there is no reason why the contract should not similarly be legal.[6] Whether Essex was thus to acquire the equivalent of majority stock control would, if the issue is properly raised by the defendants, be a factual issue to be determined by the district court on remand.

Because 28.3 per cent of the voting stock of a publicly owned corporation is usually tantamount to majority control, I would place the burden of proof on this issue on Yates as the party attacking the legality of the transaction. Thus, unless on remand Yates chooses to raise the question whether the block of stock in question carried the equivalent of majority control, it is my view that the trial court should regard the contract as legal and proceed to consider the other issues raised by the pleadings. If Yates chooses to raise the issue, it will, on my view, be necessary for him to prove the existence of circumstances which would have prevented Essex from electing a majority of the Republic board of directors in due course. It will not be enough for Yates to raise merely hypothetical possibilities of opposition by the other Republic shareholders to Essex' assumption of management control. Rather, it will be necessary for him to show that, assuming neutrality on the part of the retiring management, there was at the time some concretely foreseeable reason why Essex' wishes would not have prevailed in shareholder voting held in due course. In other words, I would require him to show that there was at the time of the contract some other organized block of stock of sufficient size to outvote the block Essex was buying, or else some circumstance making it likely that enough of the holders of the remaining Republic stock would band together to keep Essex from control.

Reversed and remanded for further proceedings not inconsistent with the judgment of this court.

CLARK, Circuit Judge (concurring in the result).

Since Barnes v. Brown, 80 N.Y. 527, teaches us that not all contracts like the one before us are necessarily illegal, summary judgment seems definitely improper and the action should be remanded for trial. But particularly in view of our lack of knowledge of corporate realities and the current standards of business morality, I should prefer to avoid too precise instructions to the district court in the hope that if the action again comes before us the record will be generally more instructive on this important issue than it now is. I share all the doubts

---

5. Loss, Securities Regulation 807 (2d ed. 1961).

6. The fact that under the Essex-Yates contract only 37½% of the price of the stock was to be paid at the closing and the balance was not to be fully paid for twenty-eight months is irrelevant to this case. There is no indication that Essex did not have sound financial backing sufficient to discharge properly the obligation which had been incurred.

580

and questions stated by my brothers in their opinions and perhaps have some additional ones of my own. My concern is lest we may be announcing abstract moral principles which have little validity in daily business practice other than to excuse a defaulting vendor from performance of his contract of sale.* Thus for fear of a possible occasional contract inimical to general stockholder interest we may be condemning out of hand what are more often normal and even desirable business relationships. As at present advised I would think that the best we can do is to consider each case on its own facts and with the normal presumption that he who asserts illegality must prove it.

I add that while New York law may render unlawful an agreement for the naked transfer of corporate office, see McClure v. Law, 161 N.Y. 78, 55 N.E. 388, the record before us does not present such a situation and there is no ground for declaring the present agreement void on its face. Surely an otherwise unlawful sale of office should not become lawful simply on the simultaneous transfer of a few shares of stock. But such formalistic niceties are not involved here, and in any event such an approach would raise factual questions to be resolved only by trial. Further I am constrained to point out that I do not believe a district court determination as to whether or not "working control" was transferred to the vendee can or should affect the outcome of this case. The contract provides for transfer of 28.3 per cent of the outstanding stock and effective control of the board of directors, and there is no evidence at this stage that the vendor's power to transfer control of the board was to be secured unlawfully, as, for example, by bribe or duress. Surely in the normal course of events a management which has behind it 28.3 per cent of

the stock has working control, absent perhaps a pitched proxy battle which might unseat it. But the court cannot foresee such an unlikely event or predict its outcome; thus it is difficult to see what further evidence on the question of control could be adduced. My conclusion that there is no reason to declare this contract illegal on its face would remain unaffected by any hypothetical findings on "control." It seems that we are all agreed on the need of a remand for trial, though we disagree as to the scope of such remand. Since our decision returns the case to the jurisdiction of the trial court, with nothing settled beyond that, the trial judge will have to decide initially at least how extensive that trial is to be. For my part I believe it incumbent on the judge to explore all issues which the pleadings may eventually raise.

FRIENDLY, Circuit Judge (concurring).

Chief Judge Lumbard's thoughtful opinion illustrates a difficulty, inherent in our dual judicial system, which has led at least one state to authorize its courts to answer questions about its law that a Federal court may ask.[1] Here we are forced to decide a question of New York law, of enormous importance to all New York corporations and their stockholders, on which there is hardly enough New York authority for a really informed prediction what the New York Court of Appeals would decide on the facts here presented, see Cooper v. American Airlines, Inc., 149 F.2d 355, 359, 162 A.L.R. 318 (2 Cir., 1945); Pomerantz v. Clark, 101 F.Supp. 341 (D.Mass.1951); Corbin, The Laws of the Several States, 50 Yale L.J. 762, 775–776 (1941), yet too much for us to have the freedom used to good effect in Perlman v. Feldmann, 219 F.2d 173 (2 Cir.), cert. denied, 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955).

* The validity of this excuse is the only question presented in this action; thus possible claims under the rule of Perlman v. Feldmann, 2 Cir., 219 F.2d 173, 50 A.L.R.2d 1134, certiorari denied Feldmann v. Perlman, 349 U.S. 952, 75 S.Ct.

880, 99 L.Ed. 1277, and other similar issues are not involved.

[1]. See Vestal, The Certified Question of Law, 36 Iowa L.Rev. 629, 643 (1951), referring to Fla.Stat.Ann. (Cum.Supp. 1950) §§ 25.031 and 25.032.

I have no doubt that many contracts, drawn by competent and responsible counsel, for the purchase of blocks of stock from interests thought to "control" a corporation although owning less than a majority, have contained provisions like paragraph 6 of the contract *sub judice*. However, developments over the past decades seem to me to show that such a clause violates basic principles of corporate democracy. To be sure, stockholders who have allowed a set of directors to be placed in office, whether by their vote or their failure to vote, must recognize that death, incapacity or other hazard may prevent a director from serving a full term, and that they will have no voice as to his immediate successor. But the stockholders are entitled to expect that, in that event, the remaining directors will fill the vacancy in the exercise of their fiduciary responsibility. A mass seriatim resignation directed by a selling stockholder, and the filling of vacancies by his henchmen at the dictation of a purchaser and without any consideration of the character of the latter's nominees, are beyond what the stockholders contemplated or should have been expected to contemplate. This seems to me a wrong to the corporation and the other stockholders which the law ought not countenance, whether the selling stockholder has received a premium or not. Right in this Court we have seen many cases where sudden shifts of corporate control have caused serious injury; Pettit v. Doeskin Products, Inc., 270 F.2d 95 (2 Cir., 1959), cert. denied, 362 U.S. 910, 80 S.Ct. 660, 4 L.Ed.2d 618 (1960); United States v. Crosby, 294 F.2d 928 (2 Cir., 1961), cert. denied Mittelman v. United States, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962); and Kirtley v. Abrams, 299 F.2d 341 (2 Cir., 1962), are a few recent examples. To hold the seller for delinquencies of the new directors only if he knew the purchaser was an intending looter is not a sufficient sanction. The difficulties of proof are formidable even if receipt of too high a premium creates a presumption of such knowledge, and, all too often, the doors are locked only after the horses have been stolen. Stronger medicines are needed—refusal to enforce a contract with such a clause, even though this confers an unwarranted benefit on a defaulter, and continuing responsibility of the former directors for negligence of the new ones until an election has been held. Such prophylactics are not contraindicated, as Judge Lumbard suggests, by the conceded desirability of preventing the dead hand of a former "controlling" group from continuing to dominate the board after a sale, or of protecting a would-be purchaser from finding himself without a majority of the board after he has spent his money. A special meeting of stockholders to replace a board may always be called, and there could be no objection to making the closing of a purchase contingent on the results of such an election. I perceive some of the difficulties of mechanics such a procedure presents, but I have enough confidence in the ingenuity of the corporate bar to believe these would be surmounted.

Hence, I am inclined to think that if I were sitting on the New York Court of Appeals, I would hold a provision like Paragraph 6 violative of public policy save when it was entirely plain that a new election would be a mere formality— i. e., when the seller owned more than 50% of the stock. I put it thus tentatively because, before making such a decision, I would want the help of briefs, including those of *amici curiae*, dealing with the serious problems of corporate policy and practice more fully than did those here, which were primarily devoted to argument as to what the New York law has been rather than what it ought to be. Moreover, in view of the perhaps unexpected character of such a holding, I doubt that I would give it retrospective effect.[2]

2. See Mr. Justice Black dissenting in Mosser v. Darrow, 341 U.S. 267, 276, 71 S. Ct. 680, 95 L.Ed. 927 (1951); Levy, Realist Jurisprudence and Prospective Overruling, 109 U.Pa.L.Rev. 1 (1960).

As a judge of this Court, my task is the more modest one of predicting how the judges of the New York Court of Appeals would rule, and I must make this prediction on the basis of legal materials rather than of personal acquaintance or hunch. Also, for obvious reasons, the prospective technique is unavailable when a Federal court is deciding an issue of state law. Although Barnes v. Brown, 80 N.Y. 527 (1880), dealt with the sale of a majority interest, I am unable to find any real indication that the doctrine there announced has been thus limited. True, there are New York cases saying that the sale of corporate offices is forbidden; but the New York decisions do not tell us what this means and I can find nothing, save perhaps one unexplained sentence in the opinion of a trial court in Ballantine v. Ferretti, 28 N.Y.S. 2d 668, 682 (Sup.Ct.N.Y.Co.1941), to indicate that New York would not apply Barnes v. Brown to a case where a stockholder with much less than a majority conditioned a sale on his causing the resignation of a majority of the directors and the election of the purchaser's nominees.

Chief Judge Lumbard's proposal goes part of the way toward meeting the policy problem I have suggested. Doubtless proceeding from what, as it seems to me, is the only justification in principle for permitting even a majority stockholder to condition a sale on delivery of control of the board—namely that in such a case a vote of the stockholders would be a useless formality, he sets the allowable bounds at the line where there is "a practical certainty" that the buyer would be able to elect his nominees and, in this case, puts the burden of disproving that on the person claiming illegality.

Attractive as the proposal is in some respects, I find difficulties with it. One is that I discern no sufficient intimation of the distinction in the New York cases, or even in the writers, who either would go further in voiding such a clause, see Berle, "Control" in Corporate Law, 58 Colum.L.Rev. 1212, 1224 (1958); Leech,

Transactions in Corporate Control. 104 U.Pa.L.Rev. 725, 809 (1956) [proposing legislation], or ·believe the courts have not yet gone that far, see Baker & Cary, Corporations: Cases and Materials (3d ed. unabr. 1959) 590. To strike down such a condition only in cases falling short of the suggested line accomplishes little to prevent what I consider the evil; in most instances a seller will not enter into a contract conditioned on his "delivering" a majority of the directors unless he has good reason to think he can do that. When an issue does arise, the "practical certainty" test is difficult to apply. The existence of such certainty will depend not merely on the proportion of the stock held by the seller but on many other factors—whether the other stock is widely or closely held, how much of it is in "street names," what success the corporation has experienced, how far its dividend policies have satisfied its stockholders, the identity of the purchasers, the presence or absence of cumulative voting, and many others. Often, unless the seller has nearly 50% of the stock, whether he has "working control" can be determined only by an election; groups who thought they had such control have experienced unpleasant surprises in recent years. Judge Lumbard correctly recognizes that, from a policy standpoint, the pertinent question must be the buyer's prospects of election, not the seller's —yet this inevitably requires the court to canvass the likely reaction of stockholders to a group of whom they know nothing and seems rather hard to reconcile with a position that it is "right" to insert such a condition if a seller has a larger proportion of the stock and "wrong" if he has a smaller. At the very least the problems and uncertainties arising from the proposed line of demarcation are great enough, and its advantages small enough, that in my view a Federal court would do better simply to overrule the defense here, thereby accomplishing what is obviously the "just" result in this particular case, and leave the development of doctrine in this area to the State, which has primary concern for it.

I would reverse the grant of summary judgment and remand for consideration of defenses other than a claim that the inclusion of paragraph 6 *ex mero motu* renders the contract void.