Norman L. Harvey, J.
This is a shareholder’s derivative action brought on behalf of Lin Broadcasting Corporation (LIN) by Louis J. Brecher who, at the time this action was *458 commenced, owned 200 shares of LIN common stock. No party challenges his right to bring the action.
LIN was incorporated in Delaware in 1961. By December, 1968 it had become a publicly-held corporation with assets of approximately $55,000,000. Currently it holds licenses issued by the Federal Communications Commission (FCC) to operate 10 radio and 2 television stations. Defendant Frederic Gregg was the principal founder of LIN and served as LIN’s president from the time of incorporation until his resignation oh January 10, 1969. In addition, Gregg was a member of the board of directors from October, 1961 to March, 1969 and chairman from February, 1967 to March, 1969. As of January 10, 1969 Gregg owned approximately 82,000 shares of LIN common stock — the largest block beneficially owned by any single person or entity.
The defendants Clyde W. Clifford, Peter J. Solomon, David Steine, Joel M. Thrope, Thomas I. Unterberg and Lind Carl Voth were directors of LIN at all times relevant herein. Defendant Alan J. Patricof was a director of LIN from February 19, 1967 until January 10, 1969 at which time an earlier tendered resignation was accepted by the LIN directors. He did not participate in any of the activities complained of by the plaintiff.
The controversy centers upon a transaction between the defendant Gregg and the Saturday Evening Post Company (SEPCO) in which the latter bought Gregg’s 82,000 shares of LIN stock. The purchase price of the stock was $3,500,000, said amount being approximately $1,260,000 more than the market price on the date of sale. Plaintiff contends that SEPCO paid Gregg a premium for Gregg’s promise to resign immediately as president of LIN; bring about the election of SEPCO’s nominee as his successor to the presidency; bring about the immediate election of three SEPCO nominees as directors; and ultimately bring about an absolute numerical majority of SEPCO nominees to the board. Plaintiff contends that the acceptance of this premium amounted to a sale of corporate office, and therefore, was illegal.
Two specific contentions of the plaintiff are:
(1) That the corporation is entitled to receive $1,260,000 of the sale price paid to the defendant Gregg as a premium; and
(2) That because the remaining directors acquiesced in Gregg’s promise and actually did vote to elect nominees of SEPCO as president and as three of its directors they are *459 liable, jointly with Gregg and severally, for the premium resulting from the sale.
A third contention will be stated and considered later in the decision.
Trial of the action was accomplished by the submission of certain exhibits which were agreed upon by all parties, the depositions of numerous witnesses, and answers to interrogatories. The court did not personally see or hear any of the witnesses when they gave their testimony.
Certain of the facts are undisputed. Sometime during the latter part of 1968 the defendant Frederic Gregg, Jr. and Martin Ackerman, then president of SEPCO, entered into negotiations for the purchase of the LIN stock owned by Gregg. Ultimately, an agreement was reached for the purchase of the stock by SEPCO for the total consideration of $3,500,000. In addition to that, Gregg agreed to relinquish certain rights that he had under an employment contract with LIN which included, among other things, stock options. The price of $3,500,000 was approximately $1,260,000 more than the then current price on the over-the-counter securities exchange in New York City.
Shortly after the agreement, defendant Gregg called a meeting of the LIN board of directors at which: defendant Alan Patricof s previously submitted resignation was accepted, thus creating a vacancy; the board voted to expand its size from 8 to 10 seats; the SEPCO nominees, Martin Ackerman, Alfred Driscoll and Milton Gould, were elected to fill the three vacancies; Gregg’s resignation as president was tendered and accepted; and Ackerman was elected as his successor.
Within a few weeks thereafter, LIN’s board of directors terminated Ackerman’s tenure as president and all SEPCO directors resigned. SEPCO then sued Gregg, LIN and others for a refund of the premium alleging that, as conditions of its purchase, it was promised that SEPCO’s nominee would be hired as president of LIN and be given a fair opportunity to supervise the management of its affairs; that SEPCO be given immediate minority representation on the board of directors and that best efforts be made to cause SEPCO to have majority representation on the board at an early date by seeking required approval from FCC. The complaint further alleged that the defendants breached the agreement by not permitting SEPCO’s nominee to the presidency an ample opportunity to manage the corporation. The complaint was dismissed at *460 Special Term because of the illegality of the agreement. Mr. Justice Saypol’s opinion will be referred to later herein.
No evidence was introduced to establish that any of the director defendants, other than Gregg, was involved in the negotiations for the sale of Gregg’s stock nor that they received any benefit therefrom.
The bulk of the evidence introduced concerned the negotiations between Martin S. Ackerman, president of SEPCO, and the defendant Gregg for the purchase of Gregg’s stock. That evidence was conflicting as to the issue of the inducement for the payment of a premium. But, from all the evidence before it, the court concludes that the defendant Gregg and SEPCO agreed upon the purchase price of $3,500,000 for Gregg’s stock (which also would result in his forfeiture of substantial stock option rights) and that the inducement for payment of a price more than $1,200,000 above the price quoted in the over-the-counter market was Gregg’s promise to deliver effective control of LIN to SEPCO. Control was to be delivered by Gregg’s resignation of the presidency and the election of SEPCO’s nominees to the presidency and three directorships.
The court concludes as a matter of law that the agreement insofar as it provided for a premium in exchange for a promise of control, with only 4% of the outstanding shares actually being transferred, was contrary to public policy and illegal. The law as it pertains to these facts was succinctly stated by Mr. Justice Saypol in his determination of the motion previously referred to. (Brecher v Gregg, NYLJ, June 15,1970, p 16, col 1.)
"The subject agreement to purchase an office is against public policy and unenforceable in this State. The employment contract cannot be saved by severance since it is an integral portion of the agreement having an illegal purpose.
"It is not alleged that by virtue of the stock purchase plaintiff acquired control with which it could then install officers and directors of its own selection. It appears on the face of the complaint that the transaction had no semblance of actual or practical control; rather, the designation of president and minority board representation remained in the actual control of the defendants but was bargained away to plaintiff.
"As stated in Matter of Lionel Corp. (NYLJ, Feb. 4, 1964, Schweitzer, J, Sup Ct NY County): 'As early as McClure v *461 Law (161 NY 78), and as late as Essex Universal Corp v Yates (305 F2d 572), it is the law of this State that it is illegal to sell corporate office or management control by itself (that is, accompanied by no stock or insufficient stock to carry voting control).’ (Affd sub nom Matter of Caplan v Lionel Corp., 20 AD2d 301, affd 14 NY2d 679.) Indeed, the illegal profit belongs to the corporation (Gabriel Ind. v Defiance Ind., NYLJ, June 17, 1964, p 13, col 8; Sarafite, J., affd 23 AD2d 630).”
Clearly, the defendant Gregg must forfeit to the corporation any illegal profit derived from his sale of stock.
But, a much more difficult question to be resolved is the determination of the issue created by the contention of the plaintiff that the directors who voted for the election of SEPCO’s nominees are jointly and severally liable to account to the corporation for the illegal profits of Gregg. No specific precedent for this contention has been offered.
To determine this issue, it is necessary to fully understand the nature of the liability to his corporation incurred by a director or officer who sells his stock at a premium. It is a liability that arises because the director or officer is considered to be in the position of a fiduciary to the corporation.
"In a broad sense, the directors and officers of a corporation are its agents, and they occupy a fiduciary, or more exactly a quasi-fiduciary, relation to the corporation and its stockholders. [Equity Corp. v Groves, 294 NY 8, 60 NE2d 19; Pink v Title Guarantee & Trust Co., 274 NY 167, 8 NE2d 321; Manson v Curtis, 223 NY 313, 119 NE 559; Godley v Crandall & G. Co., 212 NY 121, 105 NE 818; Bosworth v Allen, 168 NY 157, 61 NE 163; Seymour v Spring Forest Cemetery Assn., 144 NY 333, 39 NE 365.] They are bound by all those rules of conscientious fairness, morality, and honesty in purpose, which the law imposes as guides for those who are under the fiduciary obligations and responsibilities, and they are held, in official action, to the extreme measure of candor, unselfishness, and good faith. They are bound to exercise the utmost good faith and loyalty in the performance of their duties, to be scrupulous in such performance, and to act at all times in the interests of the corporation and the stockholders, and not for personal benefit or advantage. Directors must always be free from fraud in their relations with their shareholders; fair dealing is imperative. Indeed, it is the view frequently and broadly taken that the officers and directors of a corporation are, in substance and in effect, trustees for the corporation *462 and for its stockholders, it has been said that at least they occupy a position of partial trust. * * *
"For violation of their duty resulting in the waste of corporate assets, injury to its property, or unlawful gain to themselves, directors and officers are in fact liable to account in equity the same as ordinary trustees” (12 NY Jur, Corporations, § 717).
"It is a cardinal principle that a director or an officer of a corporation will not be permitted to make a private profit out of his official position; he must give to the corporation the benefit of any advantage which he has thereby obtained. The rule applies irrespective of the motive or good faith of the director or officer. * * * Where the president and director of a corporation was paid money by outside parties upon the condition that he procure their election as directors of the corporation with powers of control and management, such money was received by virtue of his office and from official acts and he must account to the corporation for it.” (12 NY Jur, Corporations, § 724.)
The sale of a director’s or officer’s shares can lead to a violation of such fiduciary duty in certain circumstances.
"Ordinarily, a director possesses the same right as any other stockholder to deal freely with his shares of stock and to dispose of them at such a price as he may be able to obtain, so long as he does not commit a fraud or violate his duty to the corporation. Apart from circumstances of bad faith or proof of injury to the corporation, a director who sells his stock above the current market quotations is not accountable to the corporation for any profit made on such sale.
"The sale of control of the corporation through a sale of his stock by a director or officer is not necessarily objectionable, so long as there is no fraud in the transaction or receipt of a special bonus or premium.” (12 NY Jur, Corporations, § 755.)
"A transaction in which directors or officers who own a majority of the stock of a corporation sell the stock and agree to, or resign so as to facilitate, the taking over of control by the purchasers may be legal, but such a transaction will be closely scrutinized for fraud. A director or officer can be compelled to account to the corporation for an improper sale of his stock: (1) where, in addition to the purchase price, he receives a bonus for relinquishing either his control or his office; (2) where, by a sale of his stock at a premium, he *463 conspires fraudulently to turn over control to purchasers who mismanage the corporation; and (3) where, without adequate investigation, he negligently turns over control to purchasers who pay him a bonus for the sale of his stock, and the purchasers then proceed to loot the corporate assets.” (12 NY Jur, Corporations, § 756.)
The policy underlying these principles, as stated by Chief Judge Fuld, in affirming the liability of corporate officers who had traded in their own corporation’s stock at a substantial profit on the basis of inside information, and holding that such profits could be made the basis of an accounting due the corporation is that: "[D]amages * * * [have] never been considered to be an essential requirement for a cause of action founded on a breach of fiduciary duty * * * because the function of such an action, unlike an ordinary tort or contract case, is not merely to compensate the plaintiff for wrongs committed by the defendant but * * * 'to prevent them, by removing from agents and trustees all inducement to attempt dealing for their own benefit in matters which they have undertaken for others, or to which their agency or trust relates.’
"Just as a trustee has no right to retain for himself the profits yielded by property placed in his possession but must account to his beneficiaries, a corporate fiduciary, who is entrusted with potentially valuable information, may not appropriate that asset for his own use even though, in so doing, he causes no injury to the corporation. The primary concern, in a case such as this, is not to determine whether the corporation has been damaged but to decide, as between the corporation and the defendants, who has a higher claim to the proceeds derived from the exploitation of the information. In our opinion, there can be no justification for permitting officers and directors, such as the defendants, to retain for themselves profits which, it is alleged, they derived solely from exploiting information gained by virtue of their inside position as corporate officials. * * *
"Sitting as we are in this case as a court of equity, we should not hesitate to permit an action to prevent any unjust enrichment realized by the defendants from their allegedly wrongful act.” (Diamond v Oreamuno, 24 NY2d 494, 498-501.) (See, also, Bosworth v Allen, 168 NY 157.)
The remedy is an equitable one (Equity Corp. v Groves, 294 NY 8) and only available to the extent of actual profits *464 realized by the defendant (Gabriel Ind. v Defiance Ind., 22 NY2d 405).
In summary, an officer’s transfer of fewer than a majority of his corporation’s shares, at a price in excess of that prevailing in the market, accompanied by his promise to effect the transfer of offices and control in the corporation to the vendee, is a transaction which breaches the fiduciary duty owed the corporation and upon application to a court of equity: the officer will be made to forfeit that portion of his profit ascribable to the unlawful promise as he has been unjustly enriched; and an accounting made on behalf of the corporation, since it is, of the two, the party more entitled to the proceeds.
Since there has been no showing that the actions of any directors other than Gregg either led to any pecuniary loss to the corporation or to the realization of any personal profit or gain to themselves, it follows that they cannot be held liable jointly, or severally, with Gregg for the payment of the premium over to the corporation.
In view of the fact that the court is charged with the duty to determine both the law and the facts, it must render a factual decision. There was no malfeasance or misfeasance demonstrated in the directors having voted to elect Messrs. Ackerman, Driscoll and Gould. That decision was as consistent with the future well-being and success of the corporation as the later vote to remove Ackerman. On the mere basis of hindsight, the court cannot inculpate these directors for what may or may not have been an unfortunate decision.
The third cause of action concerns itself with the following facts:
In March, 1968 LIN entered into a contract with Communications Industries Corporation (CIC) whereby LIN agreed to acquire radio station WJRZ from CIC. It was agreed that, should the FCC not approve the acquisition on or before February 14, 1969, either party could withdraw from the undertaking. In connection with the proposed acquisition, LIN deposited $250,000 in escrow to be paid to CIC if the transaction was consummated.
LIN’s original application for approval of its acquisition from CIC of radio station WJRZ was filed with the FCC on May 27, 1968. During the seven and one-half months prior to January 10, 1969, the FCC required both LIN and CIC to submit numerous addenda, including specific information with respect to the background of, and LIN’s arrangement with, an *465 officer and major stockholder of WJRZ. LIN and CIC had responded to such FCC inquiries as late as January 10, 1969, the day the LIN board elected SEPCO’s nominees to office.
On January 15, 1969, the FCC requested an explanation with respect to rumors appearing in trade publications that SEPCO was "in the process of acquiring” control of LIN. By letter dated February 10, 1969, the FCC was informed that, while SEPCO "and related interests” did desire to obtain control of LIN "at some future time”, no change of control had resulted from the election of the SEPCO nominees or SEPCO’s purchase of Gregg’s stock, and no change in control would take place without prior FCC approval.
On February 17, 1969, CIC informed LIN that, since the FCC had failed to approve the transfer to LIN of the WJRZ license on or before February 14, 1969, it was exercising the option to cancel the contract. Litigation ensued over LIN’s right to return of its good faith deposit of $250,000. The litigation was ultimately settled with CIC receiving $45,000 and the remaining $205,000 being returned to LIN. The radio station was sold to a third party for substantially more than the price offered to LIN.
Plaintiff’s third contention is that the defendants are liable to the corporation because of a loss of bargain. He claims that the Gregg-SEPCO transaction blocked FCC approval of the purchase of radio station WJRZ.
The actionability of this "lost bargain” theory necessarily hinges on a showing of eventual success in the contractual endeavor; concomitant with a showing that the Gregg-SEPCO transaction, including the actions of the board of directors, was actionable as the proximate cause of the FCC’s failure to approve before its termination. (Union Car Adv. Co. v Collier, 263 NY 386; see, also, A. S. Rampell, Inc. v Hyster Co., 3 NY2d 369; Egan Real Estate v McGraw, 40 AD2d 299.) There was practically no proof offered to support plaintiff’s contention. The court is completely unaware of the reason LIN officers or lawyers took 26 days to answer the January 15, 1969 inquiry of FCC. Neither does it have any knowledge of what transpired during the seven and one-half months from the time of the application until the Gregg-SEPCO deal. No violation of FCC regulations or policy has been brought to the court’s attention. To hold that the FCC would have approved LIN’s application on or before the February 14, 1969 deadline had it not been for the SEPCO transaction would be gross *466 speculation. The third cause of action must be dismissed for failure of proof.
It is the decision of the court that the complaint be dismissed as to all defendants other than Gregg. It is the further decision of the court that the defendant account to the corporation for any profits made in his sale to SEPCO over and above that which he would have realized, had the sale been consummated in an arm’s length, over-the-counter transaction.