**Frank NELSON et al., Plaintiffs,**

v.

**Joseph A. GAMMON et al., Defendants.**

**No. C 77–0514–L(B).**

United States District Court,
W. D. Kentucky,
Louisville Division.

Sept. 5, 1979.

Leon Seidman, Louisville, Ky., Frederick Beihl, Kansas City, Mo., for plaintiffs.

Fred Goldberg, Louisville, Ky., Bert T. Combs, H. Alexander Campbell, Louisville, Ky., for defendants.

## MEMORANDUM OPINION

BALLANTINE, District Judge.

This action arose out of the merger between National Industries, Inc. (National) and Fuqua Industries, Inc. (Fuqua). Plaintiffs, Frank Nelson and Hyman Swolsky, filed a shareholders' derivative suit on behalf of National in October, 1977, three months prior to National's merger into Fuqua. Nelson owned 100 shares of National common stock and Swolsky owned 4,592 shares when the suit was filed. The defendants include six former directors of National,[1] National itself, and Fuqua. Jurisdiction is based upon diversity of citizenship.

Count I of the complaint alleges that the individual defendants were paid a premium price for their shares of National common stock. Such premium was allegedly paid for the sale of defendants' corporate offices. Plaintiffs include the following acts as breaches of the directors' fiduciary duties: their agreement to recommend approval of the proposed tender offer to National shareholders, their agreement to approve the terms of Fuqua's proposed merger, and their agreement to use their position, influence and assistance to effectuate the merger.

Count I seeks money damages from the individual defendants totaling $3,596,921.25, which supposedly represents illegal profits from selling their stock to Fuqua. Plaintiffs have also asked the Court to unwind the merger between the two companies. Count II, which sought to obtain shareholders' records, was dismissed upon plaintiffs' stipulation on April 26, 1979. This action is now before the Court on motions for summary judgment filed by the individual defendants and by defendant Fuqua. Rule 56(b), F.R.Civ.P.

## JURISDICTION

The complaint was filed as a shareholders' derivative action pursuant to Rule 23.1, F.R.Civ.P. Provisions relating to actions by shareholders are contained in Kentucky Revised Statutes (KRS) 271A.245. Plaintiffs herein owned National stock at the time of the transactions in question. The complaint set forth the futility of seeking relief from the defendant-directors, thus satisfying KRS 271A.245.

Generally:

".  .  . a stockholder's derivative suit must state a cause of action existing in favor of the corporate entity itself. 13 Fletcher, Cyclopedia of Corporations, § 559, p. 1274; *Louisville Bridge Co. v. Dodd,* 27 Ky.Law Rep. 454, 85 S.W. 683 (1905). The wrongful act for which a derivative suit will lie may be '(1) an

---

1. The individual defendants include Joseph A. Gammon; Bernard H. Barnett; Alton J. Schneider; James F. Breuil, Sr., deceased, with personal representatives substituted as defendants; J. Howard Marshall and Frank A. Garlove.

ultra vires or illegal act of the corporate officers or of majority stockholders, (2) a fraudulent or unfair act of the corporate officers or majority stockholders, or (3) the wrongful act of a third person.' 13 Fletcher, Cyclopedia of Corporations, § 5951, p. 439. 'Stockholders' suits are especially important as a remedy for minority stockholders to call directors and controlling stockholders to account for mismanagement and fraudulent manipulation. In most cases there is a corporate right of action, but in some situations both an individual and a corporate right may arise.' Id., § 5941, p. 413." *Security Trust Co. v. Dabney,* Ky., 372 S.W.2d 401, 403 (1963).

Under 28 U.S.C. Section 1332(a)(1), the matter in controversy must exceed $10,000, exclusive of interest and costs, and be between citizens of different states. Plaintiff Nelson resides in Kansas, while Swolsky is a resident of Ohio. Four of the individual defendants are Kentucky residents, and the other two live in Texas and Oklahoma, respectively. National was a Kentucky corporation and Fuqua was incorporated under the laws of Delaware. The suit purports to be a derivative action on National's behalf, even though it was not named as a plaintiff. The real collision here is between the plaintiff stockholders and their corporation, which through its defendant-directors has become antagonistic to their claims:

> "The federal courts have established the rule that the corporation is to be aligned as a party defendant; and federal diversity jurisdiction is determinable in accordance with that alignment, where, with respect to the claim sought to be enforced with the stockholders' derivative suit, the corporation is 'antagonistic' to the stockholder." 68 A.L.R.2d 833.

The test of "antagonism" between the corporation and the stockholder was defined by the United States Supreme Court in *Smith v. Sperling,* 354 U.S. 91, 77 S.Ct. 1112, 1114, 1 L.Ed.2d 1205 (1957), where the Court said:

> "There will, of course, be antagonism between the stockholder and the management where the dominant officers and directors are guilty of fraud or misdeeds. But wrongdoing in that sense is not the sole measure of antagonism. There [will be] antagonism whenever the management is aligned against the stockholder and defends a course of conduct which he attacks."

■ If a state statute requires the corporation to be aligned as a party plaintiff, that statute controls. 68 A.L.R.2d 835. No Kentucky statute requiring such alignment has been found. Here, National has been correctly aligned as a defendant, as the conduct of the individual defendants and their defense thereof are the bases of plaintiffs' claims. Diversity jurisdiction is therefore properly maintained. *See Walden v. Elrod,* 72 F.R.D. 5, 15 (W.D.Okla.1976).

## BACKGROUND

Negotiations for the merger began in August, 1977, when defendant, Bernard H. Barnett, was contacted by J. B. Fuqua, chairman of the board and chief executive officer of Fuqua. Mr. Barnett, a Louisville attorney, was a director of National and the chairman of its executive committee. Preliminary negotiations were also conducted by defendant, Joseph A. Gammon, chairman of the board and chief operating officer of National. Initially, Fuqua sought to purchase a substantial number of shares from National directors, to maintain continuity in National's management, and ultimately to combine the companies. Mr. Fuqua wanted the merger to be based upon an exchange of Fuqua common stock for National common. In order to be a tax-free reorganization for federal income tax purposes, the number of shares of National common purchased for cash in the tender offer would have to be limited. The number purchased, when added to the number acquired in the private purchase from directors, could not exceed approximately 50% of the National common. Fuqua securities would then be exchanged for the remaining National shares. Throughout these negotiations, Fuqua common stock traded at higher prices

and greater volumes than did National common. (See Defendant Fuqua's Exh. B.) [2]

A meeting was held on september 16, 1977, at which the executives of Fuqua and National came to an agreement regarding the terms of sale of the defendant-directors' shares to Fuqua. On September 18, 1977, the individual defendants accepted a written offer from Fuqua to purchase their 959,179 shares for $10.00 per share. [3] The membership of National's board of directors did not change after the individual defendants' sale of stock. The National directors then called a meeting to consider the advisability of the tender offer to public shareholders. The directors, including all six individual defendants, voted unanimously to recommend Fuqua's proposed tender offer to National shareholders.

Fuqua announced its purchase of the individual defendants' shares the following day, along with its proposal to National public stockholders to purchase their shares at $10.00 per share with a share-for-share stock exchange, subject to the tax constrictions previously described. However, on September 27, 1977, Fuqua proposed a merger on a share-for-share exchange basis with cash election rights at $10.00 per share as part of the merger. (See Fuqua Documents 9–11).

The market price for National common stock rose and remained higher than it had been prior to the announcement of Fuqua's proposal. Between September 19, 1977, and January 3, 1978, the effective date of the merger and the last day of trading in National common, the average price for National common was $8.712. That price was 32% over its $6.598 average price for the first nine months of 1977. Daily volume averaged 19,668 shares, compared with 5,344 shares per day in the earlier part of 1977. (See Fuqua's Exh. C.)

National retained Oppenheimer & Co., Inc., an investment banking firm, to analyze the financial aspects of the proposed merger. Oppenheimer reported that the share-for-share exchange represented fair economic value to National shareholders. All seven of National's directors ultimately approved the merger agreement on November 21, 1977. National and Fuqua issued the Joint Proxy Statement which also served as a Prospectus for Fuqua securities involved in the merger. The Prospectus described the transaction in detail, including the consideration paid to the directors and Fuqua's intentions to retain management.

The proposed merger required the affirmative vote of a majority interest of National's 6,713,000 shares of voting securities outstanding. KRS 271A.365. A total of 4,344,537 shares were voted, of which 4,008,-071, or 92%, voted in favor of the merger. That figure represented 89% of the shares voted by holders other than Fuqua and defendants Gammon, Barnett and Breuil. After the merger, 2,377,934 shares of National common were tendered pursuant to the cash election. Fuqua purchased 1,936,-030 shares, the allowable maximum after honoring the two classes of preferred stock in the cash election. In addition, 441,904

---

**2.** Exhibit B contains comparative prices and trading data for each trading day between January 3, 1977, and September 16, 1977, the last day prior to the public announcement of Fuqua's plans. Exhibit B may be summarized as follows:

| Average Price | | Price Differential | | Aggregate Volume | |
|---|---|---|---|---|---|
| Fuqua | National | Amount | As % of Nat'l | Fuqua | National |
| $10.090 | $6.598 | $3.492 | 53% | 4,413,000 | 956,500 |

**3.** The six individual defendants sold a total of 959,179 shares to Fuqua, representing approximately 14.29% of the voting power of all National voting securities outstanding.

| Director | Shares Sold to Fuqua | Shares Retained |
|---|---|---|
| Mr. Gammon | 109,000 | 8,787 |
| Mr. Barnett | 188,000 | 10,923 |
| Mr. Breuil | 500,000 | 123,990 |
| Mr. Garlove | 4,000 | –0– |
| Mr. Marshall | 147,428 | –0– |
| Mr. Schneider | 10,751 | –0– |
| | 959,179 | 143,700 |

shares of National common were tendered and exchanged for Fuqua shares.

Defendants Marshall, Garlove and Schneider had sold all of their shares of National common stock to Fuqua prior to the merger. Each of these defendants testified by deposition that they had not received nor had they been promised any extra benefits, commissions, or other compensation in connection with the merger. Defendant Breuil sold Fuqua 500,000 shares of National common, and he received 123,990 shares of Fuqua common in exchange for the remainder of his National shares. The payment of dividends thereon was the only other transaction involving Fuqua and Mr. Breuil.

Mr. Barnett had been elected a director of Fuqua in 1978 for which he was paid $10,000. In that year the law firm in which he is a partner was paid $181,535 in legal fees by Fuqua. After selling 188,000 shares to Fuqua, he received 10,923 shares of Fuqua common for his remaining shares of National common. Mr. Gammon was also a director of Fuqua, but was not paid director fees. He was employed under contract by Fuqua whereby he received $225,000 in 1978, compared with $231,200 received under his 1977 contract with National. Gammon sold 109,000 shares of National common to Fuqua, and exchanged 8,787 shares for Fuqua common. Under the terms of his Fuqua employment contract, Gammon was granted an option to purchase 50,000 shares of Fuqua common.

## PLAINTIFF'S CAUSE OF ACTION

Plaintiffs' theory of liability can be summarized as follows: The individual defendants received a premium price for the sale of their stock to Fuqua. The total number of shares sold was not a majority of the outstanding voting shares nor did it carry voting control. However, the premium was received for the sale of their corporate office, influence and assistance in effecting

the merger. This sale of office allegedly became illegal when it was accompanied by insufficient stock to carry voting control. Plaintiffs specifically complain about the following acts or transactions: Gammon's employment contract, Barnett's firm's legal fees, Breuil's sale of 500,000 shares to Fuqua, "bribes" to National directors by Fuqua's purchasing their stock, and added compensation for their shares as compared with that received by National's public shareholders.

### Sale of Corporate Offices

It appears to the Court that plaintiffs have abandoned their "Sale of Control" theory[4] in favor of a "Sale of Corporate Office" argument. Plaintiffs acknowledge that the sale of the individual defendants' 959,179 shares to Fuqua did not constitute a controlling interest. Instead, plaintiffs contend that it was illegal to sell their corporate office, management control, influence and assistance when accompanied by insufficient stock to carry voting control.[5]

Plaintiffs rely on several cases to support their sale of office argument. The first of these is *Brecher v. Gregg*, 89 Misc.2d 457, 392 N.Y.S.2d 776 (1975), in which a defendant-director received a premium for the sale of his 4% stock interest to another company. The Court found that the sale had been accompanied by his promise to effect the transfer of offices and control in the corporation to the buyer. Shortly after the sale agreement, the defendant resigned as president, three of the buyer's nominees were elected to the board of directors, and one of them was elected as defendant's successor.

Another case cited by plaintiffs is *In Re Caplan's Petition*, 20 A.D.2d 301, 246 N.Y. S.2d 913 (1964). There a stockholder sought to vacate the election of seven directors to the board of Lionel Corporation. One of the board members, Roy Cohn, sold his 3% stock interest and eventually resigned his

---

4. Plaintiffs alleged in paragraphs 10 and 13 of the complaint that the individual defendants transferred control of National to Fuqua, that such control was a corporate asset, not a personal asset, and that National should recover the premium paid for the sale of that asset.

5. Plaintiffs' theory is set forth in Paragraphs 11 and 12 of the complaint.

position. Cohn somehow carried six other board members as his nominees, and they also resigned immediately after Cohn's making the sales contract. The Court vacated the election of these seven positions, finding that they were illegal.

Plaintiffs next cite *Snyder v. Epstein*, 290 F.Supp. 652 (E.D.Wis.1968), for the proposition that, "the sale of a corporate office gives rise to a cause of action for breach by such officer of the fiduciary duties owed to both the corporation and the stockholders." *Snyder*, 290 F.Supp. at 655. In *Snyder*, the defendant-directors of a life insurance company were offered a premium for their stock in the company, conditioned upon their resignation from the board of directors. Plaintiffs alleged that the sale of stock, exceeding the market value, was a premium paid to defendants for their resignation and to obtain control of the executive and investment committees. The Court, in overruling defendants' motion to dismiss, stated that reasonable inferences supported a breach of trust action on behalf of individual stockholders who were not offered $7.00 per share (price paid to defendants) or to the corporation whose controlling positions on the board of directors, executive committee and investment committee were sold.

Plaintiffs also rely on *Rosenfeld v. Black*, 445 F.2d 1337 (2d Cir. 1971), *cert. denied*, 409 U.S. 802, 93 S.Ct. 24, 34 L.Ed.2d 62 (1972), where it was held that an investment advisor to a mutual fund had violated its fiduciary duties. The Court of Appeals had to determine the obligations of an investment advisor that wished to terminate its services to an investment company. Plaintiff Rosenfeld had alleged that certain merger transactions involved a sale of advisory office. Rosenfeld's case was predicated on the advisory firm's assistance in bringing about the merger and consequent appointment of its successor advisor. The Court of Appeals held that a fiduciary duty was violated by the personal gain realized from the change of office, regardless of the prudence of the selection.

Plaintiffs also rely heavily on *Seagrave Corp. v. Mount*, 212 F.2d 389 (6th Cir. 1954), a Michigan case involving the fiduciary duties of the officers and dominant stockholders of the corporation. A proposal was made whereby thirty Seagrave stockholders would sell 35,000 shares at $20.00 per share, five dollars above the open market price. Two of Seagrave's seven directors sold 17,400 out of the 35,000 shares. The sales contract provided that the selling stockholders would deliver to the buyer the written resignations of four Seagrave directors. The Court of Appeals affirmed the trial court's finding that these four directors violated their fiduciary duty and did not act with unprejudiced exercise of their judgment for the benefit of Seagrave and all its stockholders.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

■ It is undisputed that the governing law in this case is the law of Kentucky, under which it is illegal to sell a corporate office.[6] The authority of plaintiffs' cited cases is disspelled by their particular facts and by the merger provisions of the Kentucky Business Corporation Act, KRS 271A.355–.385.

### The Alleged Premium

■ In each of the cases cited by plaintiffs, resignations from office, directorships or advisory positions accompanied the sale of stock. None of the present directors resigned their positions in conjunction with their sale of stock to Fuqua. Plaintiffs describe the purchases by Fuqua as "bribes" to the directors, and complain particularly about Gammon's employment contract, Barnett's legal fees, and Breuil's sale of 500,000 shares of National stock. Plaintiffs' allegations of bribery are highlighted by their heavy reliance on *Seagrave Corp. v. Mount, supra*, where the premium received by the

6. No Kentucky cases precisely on point have been found, but the principles governing this issue, read in conjunction with Kentucky statutory provisions, are fairly well established and generally accepted.

directors was not shared by the minority shareholders. It cannot be assumed from these bribery allegations that the defendants received something "extra" for their shares. The retention of board members and continued employment with the surviving corporation do not offend principles of Kentucky law. Absent special circumstances, the defendants are not to be cloaked in self-interest or in breach of fiduciary duties by their retention or continued employment. In *Security Trust Co. v. Dabney, supra,* the then Court of Appeals addressed this issue:

> "To make a long story short, we do not believe that the mere obtention of a directorship on the board following merger or consolidation creates a disqualifying self-interest. Were it so, many a merger would be impossible. Usually such an arrangement is considered indispensable to the interests of the respective corporations, both old and new. In the absence of special circumstances indicating otherwise, we presume that to be the case in this instance." 372 S.W.2d at 406.

The Court likens our case to *Haberman v. Murchison,* 468 F.2d 1305 (2d Cir. 1972). The Second Circuit addressed sale of directorship allegations following a proxy contest at Allegheny Corporation. The defendants were accused of receiving a premium for their sale of stock in exchange for their corporate offices and control of the corporation. Of the ten directors who were slated with the president of the company, eight of them remained following the sale. One of them who resigned had served only to protect his investment, and it was established that his resignation had not been part of the bargain. The only other defendant to resign was the president of Allegheny, whose successor was not approached until several months after the sale agreement had been reached. The Court held that there was no sale of directorships and that the transfer of the presidency was unrelated to the original agreement.

The Kentucky legislature has contemplated the continuity of management as we find here. Public interest oriented procedures are precluded from being conducted by the Kentucky Division of Securities if the tender offer is one:

> " . . . to which the target company consents, by action of its board of directors, if such board of directors has recommended acceptance thereof to shareholders and the terms thereof, including any inducements to officers or directors which are not made available to all shareholders, have been furnished to shareholders." KRS 292.560(1)(c).

Such disclosures in the Prospectus and Joint Proxy Statement were full and complete. The Prospectus Summary (pp. i–iii) contained the following information relating to this lawsuit and the "inducements" which had been offered to National's directors:

> "On September 17, 1977, Fuqua purchased an aggregate of 959,179 shares of National Common Stock from six of National's seven directors for $10 per share in cash and notes. As a result of such purchase, Fuqua presently holds 14.28% of the outstanding voting stock of National. . . .

> If the Merger is consummated, Fuqua intends to elect two of National's present directors, one of whom is Chief Executive Officer and Chairman of the Board of National and the other of whom is Chairman of the Executive Committee, to Fuqua's Board of Directors. Fuqua also intends to offer to employ such Chief Executive Officer and Chairman of the Board in a senior executive capacity until December 31, 1987 at an annual salary of $225,000 and to offer him certain stock options for Fuqua Common Stock. . . .

> Fuqua, National, and the six directors of National who sold their National Common Stock to Fuqua are defendants in an action brought by two shareholders of National alleging violations of the fiduciary duty of such National directors and seeking an injunction against the Merger and damages. . . .

> \* \* \* \* \* \*

> Fuqua presently intends that the present officers of National will, after the Merg-

er, become officers of Fuqua or of the National division or subsidiary of Fuqua." (Fuqua Prospectus, November 22, 1977.) These summations of the ongoing transactions were explained in greater detail in the Joint Proxy Statement. (*See, e. g.,* "FUQUA'S PLANS AFTER THE MERGER— Management of Fuqua and of National.) Thus, despite the disclosures of plaintiffs' allegations and certain "inducements" to directors, 92.3% of National's shareholders approved the merger agreement, including 89.6% of the holders other than defendant Fuqua and defendants Gammon, Barnett and Breuil.

■ As for the price paid by Fuqua for the National stock, the Court cannot find that such price was the result of any fiduciary chicanery. The minority shareholders received $10.00 per share on a pro-rata basis or shares of Fuqua stock valued at $10.00 per share at the time of the merger. Fuqua stock in turn maintained a value in excess of $10.00 per share for the nine months following the merger. Plaintiffs' complaint is undermined by the fact that minority shareholders received the same price, whether in cash or stock, as that received by the defendants. *See, e. g., Benson v. Braun,* 8 Misc.2d 67, 155 N.Y.S.2d 622 (Sup.Ct. Nassau Co., 1956) (where the price received was not much different from that generally available to the public, grave doubt was cast on plaintiff's allegation that transfer of office was in fact consideration for the sale.) Coupled with the perfectly legal post-merger employment and directorship arrangements, the basic allegation that the directors sold their corporate offices at a premium has been destroyed.

*Kentucky Corporation Merger Statutes*

Kentucky law provides objective guidelines to cure any problem of internal conflicts of interest in corporate transactions. The merger of domestic and foreign corporations required National to comply with the provisions of the Kentucky Business Corporation Act. KRS 271A.385(1)(a). The merger procedures required the board of directors of each corporation to approve a merger plan which set forth, *inter alia,* the names of the corporations and the name of the corporation into which they merged, the terms and conditions of the merger, the method of converting each corporation's shares into cash or other property, and changes in the articles of incorporation of the surviving corporation. KRS 271A.355.

Shareholder approval was required under KRS 271A.365. The board of each corporation had to submit the plan to a vote at respective shareholders' meetings, requiring the affirmative vote of the holders of a majority of the voting securities of each corporation. KRS 271A.365(2). After such approval, the articles of merger were executed and filed in public offices. These papers included the merger plan and the date and manner of its adoption. KRS 271A.370. The merger was then effected by the Secretary of State's issuance of the certificate of merger. KRS 271A.380.

The defendants contend that the proximate cause of National's participation in the merger was the affirmative vote of a majority of its shareholders. National's directors approved the merger plan and submitted it to the shareholders. A majority of holders was approximately 3,357,000 shares, or 2,398,000 shares above those owned by Fuqua, and about 2,254,000 in addition to the 1,102,879 total shares owned by defendants Breuil, Barnett and Gammon. Approval of the merger agreement thus required the affirmative vote of about 7,800 other shareholders, based upon the average shareholder account of 288 shares. As has been discussed, 4,008,071 shares were voted for the merger, and only 336,483 against it. This overwhelming approval by over 10,000 shareholders was the proximate cause of National's participation in the merger.

■ Plaintiffs contend that the conflict of interest created by the directors' sale of stock to Fuqua requires the disenfranchisement of those shares voted by Fuqua and by defendants Breuil, Barnett and Gammon. Plaintiffs argue that on this basis, the merger was approved by a vote of only 2,905,192 to 336,483, less than the required

638

majority in interest. However, nothing in the Kentucky merger statutes requires disqualification of shareholders from voting on a merger plan.

KRS 271A.205 deals with shareholder validation of corporate transactions involving director conflicts of interest. It reads, in pertinent part, as follows:

(1) No contract or other transaction between a corporation and one or more of its directors or any other corporation . . . in which one or more of its directors are directors or officers or are financially interested, shall be either void or voidable solely because of such relationship or interest or because such director or directors are present at the meeting of the board of directors · . . which authorizes, approves or ratifies such contract or transaction or because his or their votes are counted for such purpose, if:

(a) The contract or transaction is not manifestly unfair to the corporation and the fact of such relationship or interest is disclosed or known to the board of directors or committee which authorizes, approves or ratifies the contract or transaction by a vote or consent sufficient for the purpose without counting the votes or consents of such interested directors; or

(b) The contract or transaction is not manifestly unfair to the corporation and the fact of such relationship or interest is disclosed or known to the shareholders entitled to vote and they authorize, approve or ratify such contract or transaction by vote or written consent; or

(c) The contract or transaction is fair and reasonable to the corporation."

This statute, not yet interpreted in a reported Kentucky court decision, was adopted from Section 41 of the Model Business Corporation Act of 1969. The purpose of Section 41 was described as follows:

". . . to establish statutory guidelines for determining the validity of transactions between a corporation and one or more of its directors, or between corporations having common directors, or between a corporation and another entity in which a director of the corporation is financially interested. It validates, if the prescribed tests are satisfied, transactions with interested directors which common law rules often make voidable, if not void." Comment, Model Bus.Corp.Act Ann.2d § 41, Para. 2.

Thus, Kentucky adopted the principle that informed shareholders could validate transactions which might otherwise be subject to attack due to director self-interest. KRS 271A.205 did add, however, the requirement that the transaction must not be "manifestly unfair" to the corporation.

■ The three basic requirements to overcome director conflict include disclosure, shareholder approval of the merger, and a fair and reasonable transaction to the corporation. The Joint Proxy Statement contained the complete merger agreement. Also included were plaintiffs' charges in this lawsuit and the facts which plaintiffs claim gave rise to the conflict of interest. It has already been shown that the shareholders approved the merger by a 12 to 1 margin. Thus, the first two requirements have been satisfied.

The Court must next determine whether the merger was fair and reasonable to the corporation even though plaintiffs have not alleged otherwise. Defendants rely on *Mills v. Electric Auto-Lite Co.,* 552 F.2d 1239 (7th Cir. 1977), *cert. denied,* 434 U.S. 922, 98 S.Ct. 398, 54 L.Ed.2d 279 (1977), *rehearing denied,* 434 U.S. 1002, 98 S.Ct. 649, 54 L.Ed.2d 499 (1977), to establish the fairness of the merger. In *Mills,* the Court held that:

"[w]hen market value is available and reliable, other factors should not be utilized in determining whether the terms of a merger were fair. . . . In a market economy, market value will always be the primary gauge of an enterprise's worth. . . . If we were to independently assess criteria other than market value in our effort to determine whether the merger terms were fair, we would be substituting our abstract judgment for

that of the market. Aside from the problems that would arise in deciding how much weight to give each criterion, such a method would be economically unsound." *Mills, supra,* at 1247.

Generally, Kentucky courts find "that the best evidence of market value is the price at which stock is bought at bona fide, voluntary sales." *Albert v. Black Motor Co.,* Ky., 357 S.W.2d 714, 718 (1962).

The terms of the instant merger appear to be fair beyond reason. Fuqua common stock was exchanged on a one-to-one ratio for National common. Fuqua common had traded at a premium over National common during 1977 until the September 19 announcement of Fuqua's proposal. The market price ratio of Fuqua to National was 1.51/1.00 for the six months prior to the announcement. It has already been shown that during the eight and one-half months prior to the public announcement of Fuqua's proposal, Fuqua common stock averaged $3.492 higher per share than National common stock. After the announcement, until its final trading day, National common stock averaged $8.712 per share, compared with $6.598 for the prior period. Average daily volume also rose from 5,344 shares to 19,668 shares. Obviously, Fuqua's proposal bolstered confidence in National's stock with an eye toward the proposed merger.

■ The option to receive Fuqua shares and/or $10.00 per share on a pro-rata basis cannot be described as anything but fair to National shareholders. The preliminary approval of the plan by National directors was based in part upon the report prepared by Oppenheimer & Co., Inc., which assessed the financial terms of the proposed merger. Oppenheimer described the one-for-one exchange of stock with a cash alternative as representing "fair economic value to the Common and Series A and Series B Preferred public stockholders of National." (Deft. Fuqua's Document No. 12). National shareholders overwhelmingly approved the plan at the meeting concluded on January 3, 1978. Mailings of Fuqua stock certificates to former National shareholders began on or about March 1, 1978. As of March 17, 1978, Fuqua stock had attained a daily trading average above $10.00 (See Affidavit Almstedt Brothers Rep.). The instant merger proceedings thus satisfied the requirements of KRS 271A.205(1)(a) and (b), and the terms thereof were fair and reasonable to National as required by KRS 271A.205(1)(c).

## MOTIONS FOR SUMMARY JUDGMENT

The United States Supreme Court has clearly stated the standards to be applied in ruling upon a motion for summary judgment pursuant to Rule 56(c), F.R.Civ.P.:

> Summary judgment should be entered only when the pleadings, depositions, affidavits, and admissions filed in the case "show that . . . there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Poller v. Columbia Broadcasting System,* 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962).

The moving party must show the absence of any genuine issue of material fact, and the evidence submitted to the court "must be viewed in the light most favorable to the opposing party." *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

Plaintiffs contend that while the movant's papers are to be closely scrutinized, those of the opponent are to be viewed indulgently. *Bohn Aluminum & Brass Corp. v. Storm King Corp.,* 303 F.2d 425, 427 (6th Cir. 1962); *See 6 Moore's Federal Practice,* Para. 56.15[5], at 56–472 (2d Ed. 1976). The plaintiffs urge the Court to adopt a more stringent standard because this lawsuit is a derivative action on behalf of a corporation. The Court is well aware that most derivative actions are not suited to summary disposition. *See, e. g., Weiss v. Kay Jewelry Stores, Inc.,* 152 U.S.App.D.C. 350, 470 F.2d 1259 (D.C.Cir.1972) (court perceived genuine issues of material fact regarding defendants' motive and intent); *Schoenbaum v. Firstbrook,* 405 F.2d 215 (2d Cir. 1968), *cert. denied,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969) (allegations contained a sufficient factual basis to

allow plaintiff's discovery procedures); *Nussbacher v. Chase Manhattan Bank (N.A.),* 444 F.Supp. 973 (S.D.N.Y.1977) (where credibility was involved, trial judge preferred opportunity to observe the demeanor of the witnesses).

Plaintiffs argue that intent, good faith, and subjective feelings play dominant roles in this lawsuit. In their eyes, the pivotal issue "is whether the individual defendants breached their duties as directors of National by their sale of stock to Fuqua *on preferential terms* while at the same time voting to approve and promoting the proposed merger." (Emphasis added.) (Plaintiff's Consolidated Memorandum, p. 5.) Plaintiffs inject credibility as a key to resolving disputed inferences which could be drawn from uncontested facts, thus precluding defendants' motions for summary judgment.

The Sixth Circuit recently held that cases involving questions of motive or intent are normally not suited to disposition on summary judgment. *Smith v. Hudson,* 600 F.2d 60 (6th Cir. 1979). The Court was confronted with a genuine issue as to whether school board members had acted with improper motive in terminating a school bus driver. However, the Court does not feel that any such genuine issue exists as to the defendants' intent, good faith or motive surrounding National's merger into Fuqua. Plaintiffs have not uncovered or produced any genuine issue as to the propriety of defendants' actions or the validity of the merger proceedings. The Court is satisfied that defendants did not sell their stock on preferential terms as alleged by the plaintiffs. In addition, no sale of corporate office accompanied the transfer of their 959,179 shares to Fuqua. Defendants have thus refuted every theory advanced by the plaintiffs in the complaint and in the papers opposing summary judgment. Unlike the situation in *Schoenbaum,* the plaintiffs' allegations do not have a sufficient factual basis to support their claims, making summary judgment appropriate in this case. *Oberon v. General Host Corp.,* 352 F.Supp. 20 (S.D.N.Y.1972). *See also Dickheiser v. Pennsylvania Railroad Co.,* 5 F.R.D. 5, 10 (E.D.Pa.1945), *affirmed,* 155 F.2d 266 (3d Cir. 1946), *cert. denied,* 329 U.S. 808, 67 S.Ct. 620, 91 L.Ed. 689 (1947).

An appropriate Order has been entered this 5th day of September, 1979.